1
2
3
4
5

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ANTHONY GRAZIA, <br><br> Plaintiff, <br><br> v. <br><br> SAFECO INSURANCE COMPANY OF ILINOIS, a foreign corporation, <br><br> Defendant. | Case No. <br><br> King County Case No. 16-2-27476-5 SEA <br><br> **NOTICE OF REMOVAL PURSUANT TO 28 USC § 1332, 28 USC § 1441 and 28 USC § 1446** <br><br> **(Clerk's Action Required)** |

**TO:** The Clerk of the United States District Court for the Western District of Washington;

**AND TO:** Anthony Grazia, Plaintiff;

**AND TO:** Douglas T. Weinmaster, Plaintiff's Attorney;

     PLEASE TAKE NOTICE that Defendant Safeco Insurance Company of Illinois hereby removes to this Court the state court action described below. In support thereof, Defendant states as follows:

     1.    Plaintiff filed the Summons and Complaint in King County Superior Court on November 10, 2016. On or about November 15, 2016, Plaintiff served the Summons and Complaint on the Office of the Insurance Commissioner who served Defendant on November 15, 2016. The cause number assigned to the King County Superior court case is 16-2-27476-5 SEA.

NOTICE OF REMOVAL – 1

2.      Lisa Liekhus, former attorney for Defendant, filed a Notice of Appearance on December 5, 2016.

3.      George A. Mix, current attorney for Defendant, filed a Notice of Withdrawal and Substitution on January 30, 3017.

## PARTIES

4.      In his complaint, Plaintiff alleges he is a resident of Fairfield County, Connecticut. **Exhibit A**. Upon information and belief Plaintiff has never been a resident of Washington State.

5.      Defendant Safeco Insurance Company of Illinois is a foreign insurance company. **Exhibit A**. Its registered address is in the State of Illinois with its principal place of business in Boston, Massachusetts. Defendant Safeco Insurance Company of Illinois is licensed to conduct business in the State of Washington.

6.      This is a Connecticut insurance policy issued to Plaintiff, Connecticut resident, via a Connecticut Insurance Agent. **Exhibit E**.

## AMOUNT IN CONTROVERSY

7.      The removing Defendant bears the burden of establishing by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. *Sanchez v. Monumental Life Ins. Co.*, 102 F .3d 398, 404 (9th Cir. 1996).

8.      This case involves a claim for Underinsured Motorist (UIM) benefits. **Exhibit A**. The Connecticut Supreme Court has recognized the dual purposes of underinsured benefits of providing compensation for the victims of underinsured motorists, while simultaneously adhering to the principle that uninsured motorist coverage is to place the insured in the same position as, but no better position than, the insured would have been had the underinsured tortfeasor been fully insured. *Gen. Acc. Ins. Co. v. Mortara*, 52 Conn. Supp. 522, 540–41, 72

NOTICE OF REMOVAL – 2

Mix Sanders Thompson, PLLC
1420 Fifth Avenue, Suite 2200
Seattle, WA 98101
Tel: 206-521-5989
Fax: 888-521-5980

A.3d 482, 493–94 (Conn. Super. Ct. 2012), *aff'd sub nom. Gen. Accident Ins. Co. v. Mortara*, 141 Conn. App. 571, 62 A.3d 553 (2013), *aff'd sub nom. Gen. Acc. Ins. Co. v. Mortara*, 314 Conn. 339, 101 A.3d 942 (2014).  The public policy behind Connecticut's UIM statute "is to give a personal injury claimant access to insurance protection to compensate for the damages that would have been recoverable if the underinsured motorist had maintained *an adequate policy of liability insurance.*"  *Id.* (emphasis in original).

9.     This Connecticut insurance policy at issue (**Exhibit E**) provides, in part,:

> E.  We will not make a duplicate payment under this
> coverage for any element of loss for which
> payment has been made by or on behalf of
> persons or organizations who may be legally
> responsible
>
> F.  We will not pay for any element of loss if
> person is entitled to receive payment for the
> same element of loss under any of the following
> or similar law:
> 1. Workers compensation law; or
> 2. Disability benefits or occupational disease
> laws.

10.     Plaintiff settled with the tortfeasor, Vallen Brewer, for Brewer's liability policy limits of $100,000. **Exhibit F**. Plaintiff also received Labor and Industries benefits $3,600.47 as a result of this accident. **Exhibit G**. The gross value of Plaintiff's claim, therefore, needed to exceed, at a minimum, $178,600.47 in order for there to be more than $75,000.00 "in controversy" as required by 28 U.S.C. § 1332(b).

11.     The complaint lacks specificity concerning the extent of Plaintiff's claimed damages. On those allegations alone, and in light of the foregoing payments Plaintiff already received from other sources, it was not possible to conclude Plaintiff was seeking damages in excess of $75,000 as required by 28 U.S.C. § 1332(b).

NOTICE OF REMOVAL – 3

12.    On June 27, 2017, however, Defendant received via email a demand that seeks $23,832.99 in past medical expenses and $1,000,000 in non-economic damages. **Exhibit D**.

## JURISDICTION

13.    For purposes of determining jurisdiction under 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Connecticut. Defendant Safeco Insurance Company of Illinois is a citizen of the State of Illinois.

14.    It is now known the amount in controversy exceeds $75,000.00. **Exhibit D**.

15.    This Court, therefore, has jurisdiction pursuant to 28 U.S.C. § 1332 and removal is proper pursuant to 28 U.S.C. § 1441.

## TIMELINESS

16.    "The mechanics and requirements for removal are governed by 28 U.S.C. § 1446. Section 1446(b) identifies two thirty-day periods for removing a case." *Kuxhausen v. BMW Financial Services NA LLC*, 707 F.3d 1136, 1139 (9th Cir. 2013).

17.    Under 28 U.S.C. § 1446(b)(1), "the first thirty-day period is triggered if the case stated by the initial pleading is removable on its face." *Id.* In such a case, the notice of removal must be filed within 30 days after the defendant receives a copy of the initial pleading setting forth the claim for relief. 28 U.S.C. § 1446(b)(1). To avoid saddling defendants with the burden of investigating jurisdictional facts, the Ninth Circuit has held that the ground for removal must be revealed affirmatively in the initial pleading for the first thirty-day clock under § 1146(b) to begin. *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1139 (9th Cir. 2013) quoting *Harris v. Bankers Life & Cas. Co.,* 425 F.3d 689, 693 (9th Cir. 2005).

18.    Under 28 U.S.C. § 1446(b)(3), "the second thirty-day removal period is triggered if the initial pleading does not indicate that the case is removable, and the defendant receives a copy of an amended pleading, motion, order or other paper from which removability may first

NOTICE OF REMOVAL – 4

be ascertained." *Kuxhausen*, 707 F.3d at 1139 quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 885 (9th Cir. 2010). A defendant may then file a notice of removal within 30 days after receiving such amended paper. 28 U.S.C. §1446(b)(3).  This is the situation in the instant case by virtue of Plaintiff's demand dated June 27, 2017.

19.    "Although every complaint is either capable of being removed or not, for the purpose of assessing timeliness [the Ninth Circuit] do[es] not treat the concept as a strict dichotomy." *Kuxhausen*, 707 F.3d at 1139.  Rather, some pleadings are 'indeterminate' in the sense that the face of the complaint does not make clear whether the required jurisdictional elements are present. *Id* citing *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 693 (9th Cir. 2005).

20.    In *Harris*, the Ninth Circuit explained the time requirements for giving notice of removal:

> We now conclude that notice of removability under § 1446(b) is determined through examination of the four corners of the applicable pleadings, not through subjective knowledge or a duty to make further inquiry. Thus, the first thirty-day requirement is triggered by defendant's receipt of an "initial pleading" that reveals a basis for removal. If no ground for removal is evident in that pleading, the case is "not removable" at that stage. In such case, the notice of removal may be filed within thirty days after the defendant receives "an amended pleading, motion, order or other paper" from which it can be ascertained from the face of the document that removal is proper.

425 F.3d at 694.

21.    The Second and Eighth Circuit Courts have specifically held, "the removal clock does not start to run until the plaintiff serves the defendant with a paper that explicitly specifies the amount of monetary damages sought." *Moltner v. Starbucks Coffee Co.*, 624 F.3d 34, 38 (2d Cir. 2010).

22.    Plaintiff's Complaint failed to reveal a basis for removal as it merely "prays for judgment against the defendant SAFECO INSURANCE under the terms and conditions of its

NOTICE OF REMOVAL – 5

Mix Sanders Thompson, PLLC
1420 Fifth Avenue, Suite 2200
Seattle, WA  98101
Tel: 206-521-5989
Fax: 888-521-5980

underinsured motorist coverage for all special and general damages alleged herein…" **Exhibit A**. Based on the four corners on Plaintiff's Complaint, Defendant could not reasonably conclude Plaintiff sought damages in an amount greater than $178,600.47 (the minimum jurisdictional limit plus the sum of the underlying settlement and Labor and Industries payments), particularly considering Plaintiff's alleged medical expenses were only $23,832.99. **Exhibit D**.

23.     Plaintiff's written demand for Underinsured Motorist coverage policy limits was emailed to counsel for Safeco Insurance Company of Illinois on June 27, 2017 and, pursuant to Washington Civil Rule 5(b)(1), considered served on June 30, 2017. The date of filing this Notice of Removal is within thirty (30) days from the date this matter first became removable.

## INTRADISTRICT ASSIGNMENT

24.     Pursuant to Local Rule 101(e), this case should be assigned to the Seattle Division because the case is removed from King County Superior Court. Plaintiff alleges in the Complaint that he is a resident of Connecticut and that Safeco Insurance Company of Illinois is a foreign corporation doing business in the State of Washington. **Exhibit A**.

## COPY OF SUMMONS AND COMPLAINT

25.     Defendant is filing, contemporaneously with this Notice of Removal, true and correct copies of (1) the operative complaint as a separate attachment in the ECF system labeled as the complaint as **Exhibit A**; (2) a certificate of service which lists all counsel who have appeared in this action with their contact information, including email addresses as **Exhibit B**; and (3) a copy of the Jury Demand filed in the state court as **Exhibit C**.

26.     Within fourteen days of the notice of this removal Defendant will file copies of all additional records and proceedings in state court along with a verification that they are true and complete copies of all records and proceedings.

NOTICE OF REMOVAL – 6

Mix Sanders Thompson, PLLC
1420 Fifth Avenue, Suite 2200
Seattle, WA  98101
Tel: 206-521-5989
Fax: 888-521-5980

1       27.    Attached to this Notice as **Exhibit D** is a true and correct copy of Plaintiff's

2 demand for his Underinsured Motorist coverage policy limits of $500,000.00 that was received

3 via email on June 27, 2017 at 2:53 PM.

4       28.    Attached to this Notice as **Exhibit E** is a true and correct copy of the certified

5 Connecticut insurance policy issued to Plaintiff.

6       29.    Attached to this Notice as **Exhibit F** is a true and correct copy of Plaintiff's

7 settlement agreement with the tortfeasor, Vallen Brewer.

8       30.    Attached to this Notice as **Exhibit G** is a true and correct copy of a Labor and

9 Industries Ledger confirming payments to plaintiff for the automobile accident at issue.

10       31.    Defendant will file the appropriate notice of this removal with the Clerk of the

11 King County Superior Court for Cause Number 16-2-27476-5 SEA.

12

13       Dated this 26th day of July, 2017

14                        MIX SANDERS THOMPSON, PLLC

15

16                        s/George A. Mix
                       George A. Mix, WBSA No. 32864
                       MIX SANDERS THOMPSON, PLLC

17                        1420 Fifth Avenue, Ste. 2200
                       Seattle, WA  98101

18                        Tel:    206-521-5989
                       Fax:    888-521-5980

19                        Email: george@mixsanders.com
                       Attorney for Defendant

20

21

22

23

24

NOTICE OF REMOVAL – 7

**CERTIFICATE OF SERVICE**

I, Leyda Greenwood, certify that on July 26, 2017 I caused to be served a true and correct copy of the foregoing NOTICE OF REMOVAL via the method indicated below and addressed to the following:

Douglas T. Weinmaster
555 South Renton Village Pl Suite 640
Renton WA 98057
*Attorney for Plaintiff*
☒Legal Messenger
☐U.S. Mail
☐Hand Delivered
☒King County electronic service
☒E-mail

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

s/Leyda Greenwood
Mix Sanders Thompson, PLLC
1420 Fifth Avenue, 22nd Floor
Seattle, WA  98101
Tel:    206-521-5989
Fax:    888-521-5980

NOTICE OF REMOVAL – 8

EXHIBIT A



RECEIVED
NOV 1 5 2016
INSURANCE
COMMISSIONER

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| ANTHONY GRAZIA, | NO.: 16-2-27476-5 SEA |
| Plaintiff, | |
| v. | **COMPLAINT FOR UNDERINSURED MOTORIST BENEFITS/DAMAGES** |
| SAFECO INSURANCE COMPANY OF ILLINOIS, a foreign corporation, | |
| Defendant. | |

COMES NOW the Plaintiff, ANTHONY GRAZIA, by and through his attorneys of

record, HARDWICK & PENDERGAST P.S., and for cause of action against the Defendant,

states and alleges as follows:

I.

The Court has jurisdiction over the subject matter herein and the parties hereto.

II.

At all times relevant hereto, Plaintiff ANTHONY GRAZIA was a resident of

Fairfield County, Connecticut.

III.

At all times material hereto, Defendant SAFECO INSURANCE COMPANY OF

ILLINOIS was a foreign corporation, licensed to do business in the State of Washington, and

COMPLAINT FOR UNDERINSURED
MOTORIST BENEFITS/DAMAGES - 1

HARDWICK & PENDERGAST, P.S.
ATTORNEYS AT LAW
555 SOUTH RENTON VILLAGE PLACE, SUITE 640
RENTON, WASHINGTON 98057
(425) 228-3860 FAX: (425) 226-4988

1    doing business in King County, Washington.

2                                    IV.

3         At all times material hereto, ANTHONY GRAZIA was insured by SAFECO

4    INSURANCE under automobile insurance policy number K2084427; which policy includes

5    underinsured motorist coverage.  This policy was in full force and effect at the time of the

6
7    November 17, 2013, automobile accident described below.

8                                    V.

9         On or about November 17, 2013, ANTHONY GRAZIA was a passenger in a 2013

10   Ford Edge driven by Patrick Peach. The Ford Edge was traveling Northbound on Interstate 5

11   near State Route 523 in King County, Washington when a 2013 Ford F150 driven by Vallen

12
13   Brewer suddenly made a U-turn and began traveling on I-5 in the wrong direction colliding

14   head on with the vehicle Plaintiff was a passenger in.  Upon impact, Plaintiffs vehicle lost

15   control and rolled over. The negligence of the driver of the Ford F150 was the sole proximate

16   cause of this accident.

17                                   VI.

18        As a direct and proximate result of the automobile accident described above, Plaintiff

19   ANTHONY GRAZIA sustained personal injuries, incurred medical expenses and may incur

20   medical expenses in the future, incurred pain and suffering, mental, physical, and emotional,

21
22   and will suffer pain in the future, and will continue to suffer loss of wages and earnings

23   capacity.

24                                   VII.

25        A demand for damages was made by ANTHONY GRAZIA to SAFECO

**COMPLAINT FOR UNDERINSURED**
**MOTORIST BENEFITS/DAMAGES - 2**

HARDWICK & PENDERGAST, P.S.
ATTORNEYS AT LAW
555 SOUTH RENTON VILLAGE PLACE, SUITE 640
RENTON, WASHINGTON 98057
(425) 228-3860  FAX: (425) 226-4988

1   INSURANCE pursuant to the underinsured motorist coverage which was purchased by the

2   named insured. ANTHONY GRAZIA and Defendant SAFECO INSURANCE disagree over

3   the value of ANTHONY GRAZIA's claim. SAFECO INSURANCE accepted premiums for

4   providing underinsured motorist coverage from the Grazia family for years. SAFECO

5   INSURANCE through its employees and agents, owe their insured's a duty of good faith and

6   fair dealing as required by Washington Law.

7   VIII.

8   

9   Plaintiff's hereby waives the physician-patient privilege only to the extent required

10  by the Revised Code of Washington, as limited by the Plaintiff's constitutional right of

11  privacy, contractual right of privacy, and the ethical obligation of physicians and attorneys

12  not to engage in ex parte contact between a treating physician and the patient's legal

13  adversaries.

14  WHEREFORE, Plaintiff, ANTHONY GRAZIA, prays for judgment against the

15  defendant SAFECO INSURANCE under the terms and conditions of its underinsured

16  motorist coverage for all special and general damages alleged herein, for pre-judgment

17  interest on all liquidated sums, and for all costs and expenses incurred herein, including a

18  reasonable attorney's fee and for such other and further relief as the court may find fair and

19  just.

20  //

21  //

22  //

23  

24  

25  

**COMPLAINT FOR UNDERINSURED**
**MOTORIST BENEFITS/DAMAGES - 3**

HARDWICK & PENDERGAST, P.S.
ATTORNEYS AT LAW
555 SOUTH RENTON VILLAGE PLACE, SUITE 640
RENTON, WASHINGTON 98057
(425) 228-3860  FAX: (425) 226-4988

1

2    DATED this 9th day of November, 2016.

3

4                              HARDWICK & PENDERGAST, P.S.

5

6

7                              Doug Weinmaster, WSBA #28225
                               Michelle M. Owens, WSBA #47112
8                              Of Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**COMPLAINT FOR UNDERINSURED**                    HARDWICK & PENDERGAST, P.S.
**MOTORIST BENEFITS/DAMAGES - 4**                         ATTORNEYS AT LAW
                                                  555 SOUTH RENTON VILLAGE PLACE, SUITE 640
                                                       RENTON, WASHINGTON 98057
                                                  (425) 228-3860  FAX: (425) 226-4988

EXHIBIT B

**SERVICE LIST**

Douglas T. Weinmaster, WSBA No. 28225
Michelle M. Owens, WSBA No. 47112
Hardwick & Pendergast, P.S.
555 S Renton Village Pl Ste 640
Renton, WA 98057
425-228-3860
doug@hardwickpendergast.com
mowens@hardwickpendergast.com
Attorneys for Plaintiff

George A. Mix, WBSA No. 32864
Mix Sanders Thompson, PLLC
1420 Fifth Avenue, Ste. 2200
Seattle, WA  98101
206-521-5989
Email: george@mixsanders.com
Attorney for Defendant

EXHIBIT C

1

2

3

4

5

6 **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

7

8 ANTHONY GRAZIA,                                                    No. 16-2-27476-5 SEA

                                        Plaintiff,

9                                                                    **JURY DEMAND**

10 v.

11 SAFECO INSURANCE COMPANY OF
ILINOIS, a foreign corporation,

12                                        Defendant.

13

14

          COMES NOW the defendant, and depositing herewith the sum of Two Hundred and

15 Fifty Dollars ($250.00) with the Clerk, does hereby demand a trial by jury of twelve (12) in the

16 above-entitled matter.

17

18          Dated this 26th day of July, 2017

19                                        MIX SANDERS THOMPSON, PLLC

20

21                                        s/George A. Mix
                                          George A. Mix, WBSA No. 32864
22                                        Attorney for Defendant

23

24

JURY DEMAND  – 1

## CERTIFICATE OF SERVICE

I, Leyda Greenwood, certify that on July 26, 2017 I caused to be served a true and correct copy of the foregoing JURY DEMAND via the method indicated below and addressed to the following:

Douglas T. Weinmaster
555 South Renton Village Pl Suite 640
Renton WA 98057
*Attorney for Plaintiff*
☐ Legal Messenger
☐ U.S. Mail
☐ Hand Delivered
☐ Facsimile
☐ E-mail
☒ KCLGR 30 electronic service

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

s/Leyda Greenwood
Mix Sanders Thompson, PLLC
1420 Fifth Avenue, 22nd Floor
Seattle, WA 98101
Tel:    206-521-5989
Fax:    888-521-5980

JURY DEMAND  – 2

EXHIBIT D

# HARDWICK & PENDERGAST, P.S.

ATTORNEYS AT LAW

JOSEPH E. PENDERGAST, III
DOUGLAS T. WEINMASTER
MICHELLE M. OWENS
SHANE M. MORIARTY

June 26, 2017

**_Sent Via E-Mail and U.S. Mail_**

George A. Mix, Esq.
1420 5th Ave, Suite 2200
Seattle, WA 98101
george@mixsanders.com

| | |
|---|---|
| Our Client: | Anthony Grazia |
| Claim Number: | 192045895039 |
| Date of Loss: | 11/16/2013 |
| Trial Date: | 11/06/2017 |

Dear Mr. Mix:

Please accept this letter as a demand for the Underinsured Motorist coverage policy limits which we understand to be $500,000 with Liberty Mutual / SAFECO. As you know, Anthony Grazia was severely and permanently injured in roll-over collision on November 16, 2013, caused by an underinsured motorist, Vallen Brewer. Previously, the third partly policy of $100,000 was paid under Vallen Brewer's policy through SAFECO. We understand that SAFECO insurance may have accessed the third-party file to assess the value of this UIM claim.

This letter is submitted under ER 408 for the purposes of settlement negotiations and this communication is not an admission against interest nor is it admissible at trial. This demand is submitted on the condition that it not be used in the event that this matter is tried in court.

We look forward to discussing this matter further with you, or with the adjuster currently assigned to this case at Liberty Mutual. Please feel free to contact us if you require additional information or explore settlement opportunities.

## FACTS OF THE COLLISION

On November 17, 2013, Anthony Grazia was a passenger in a 2013 Ford Edge driven by Patrick Peach. The Ford Edge was traveling Northbound on Interstate 5 near State Route 523 in King County, Washington when a 2013 Ford F150 driven by an underinsured driver suddenly made a U-turn and began traveling on I-5 in the wrong direction colliding head on with the vehicle

June 27, 2017
Page 2

Plaintiff Anthony Grazia was a passenger in. Upon impact, the vehicle Plaintiff was a passenger in lost control and rolled over 3.5 times before coming to rest upside down. The negligence of the driver of the Ford F150 was the sole proximate cause of this accident.

*Photographs of the Mr. Grazia's vehicle on the date of loss*





June 27, 2017
Page 3



## DAMAGES

### Harborview Medical Center ER

Immediately following the collision, Mr. Grazia was transported by ambulance, arriving on backboard with a C-collar in place. He presented to Harborview Medical Center with initial complaints of right side neck pain and right side shoulder pain. Dr. Bartek ordered a chest x-ray, pelvic films, and CT of the spine, which found no fractures, malalignment or injury. After medical evaluation and trauma workup, Dr. Matthew Bartek, MD diagnosed Mr. Grazia with neck strain and advised to follow up with his primary care doctor upon return to his home state of Connecticut.

### The Everett Clinic

On November 18, 2013, Mr. Grazia presented to The Everett Clinic for evaluation following the motor vehicle collision which occurred about 36-37 hours ago. Mr. Grazia was seen by Dr. Jeanine Sommerville. Upon discussion, it was noted that there was no loss of consciousness, air bags did deploy, and Mr. Grazia was hanging upside down, crawled out and lied down. First responders were present and recommend transport at which time he was taken to Harborview Medical Center. Dr. Sommerville noted current complaints of headache, neck sore/stiff/pain, left hand (2nd knuckle swollen) swollen with symptoms not improving since the collision. It is also important to note that Mr. Grazia's headache was identified as **"severe"** with neck tenderness. Swelling and bruising of the mcp of the 2nd finger on the left. No obvious rash or exposed skin. **Dr. Sommerville diagnosed him with cervical strain, acute (847.0),**

June 27, 2017
Page 4

**concussion (850.9), and headache (784.0)**.  Muscle relaxers and pain medication were prescribed.  Additionally, a referral was given for massage and physical therapy, and advised to return if symptoms worsen or fail to improve as anticipated.

## Harborview Neurology Clinic

As a result of an ongoing headache, neck pain, and memory problems, Mr. Grazia self-referred to the Neurology Clinic at Harborview on November 26, 2013, and was seen by Dr. Sara K. Schepp, MD.  Mr. Grazia detailed the events of the collision, stating the **car flipped three times and landed first on his side of the car and then turned upside down.** It was noted that Mr. Grazia started to notice a headache in the center of his head as well as neck pain immediately afterward.  These things persisted and in fact got worse the second day. **Mr. Grazia also said he had a hard time focusing.**  Dr. Schepp also noted that Mr. Grazia was in town for the past 11 weeks as a movie producer and normally lives in a small town in Connecticut.  Mr. Grazia stated that it had been difficult completing his job the past few days, but fortunately had a co-producer, who could help with much of the work tasks.  **Mr. Grazia was concerned about the memory loss and whether it was safe for him to go home for Thanksgiving**.  A CT of the head and CTA of the head and neck were ordered which came out normal.  **Mr. Grazia was diagnosed with post-concussive syndrome** and prescribed amitriptyline and methocarbamol for muscle pain.

## Highline Medical Center

**On December 5, 2013, Mr. Grazia was transported by ambulance to the emergency department at Highline Medical Center, due to vomiting, nausea and dizziness**, which started that day at 2100 while Mr. Grazia was at the airport. Also, noted sweats, some difficulty with vision focusing, and some abdominal pain which he suspected was muscular and result of vomiting. Mr. Grazia's dizziness is not worsened by rotating head, though he noted dizziness is characterized by spinning sensation. Mr. Grazia also stated that walking then would be challenging. Since being diagnosed with concussion, he has had headaches and some post-concussive memory loss. Mr. Grazia stated he ate salad and chicken 4 hrs. ago. During his stay at the hospital, Mr. Grazia had vomited several times. He is allergic to ibuprofen and aspirin. Records from Harborview Medical Center were ordered of the head CT and head and neck CTA which rule out cerebral contusions, traumatic hemorrhages, or dissections which was negative. After receiving medication, Mr. Grazia felt better and was discharged.

## Western CT Medical Group

On December 30, 2013, Mr. Grazia presented to New Fairfield Family Practice (a/k/a Western Connecticut Medical Group), 6 weeks post MVA, with initial complaints of headaches and insomnia.  Mr. Grazia was seen by Dr. William Biles. Upon discussion, it was noted that Mr. Grazia developed headache and difficulty with memory and concentration. He saw neurologist, had CT of head and was diagnosed with post-concussive syndrome and came in for follow-up.  He continues to have headaches and difficulty with memory. He had an episode of vertigo prior to returning home which lasted 3 hours and sent him back to the ER. He was given

June 27, 2017
Page 5

IV meds and vertigo resolved. He has had OCC mid recurrent of vertigo but quickly controlled with medication. He has only needed 3 since ER visit. He gets fatigued easily. He denies any visual changes, fevers or chills. He has some right neck pain and is sleeping poorly - at least part to bad dreams. Assessment: post concussive syndrome (310.20), ongoing headache, poor memory, fatigue, and vertigo. Dr. Biles referred Mr. Grazia to neurologist to consider further test if symptoms persist more than 3 months.

## Associated Neurologists

On February 7, 2014, Mr. Grazia presented to Associated Neurologists, upon referral by Dr. Biles, for an initial consultation with Dr. Samuel Mankind. It was noted that Mr. Grazia's chief complaints were headaches, memory loss, and dizziness. Associated symptoms to include neck pain, short-term memory loss, interrupted sleep. Dr. Mankind ordered a neuropsychological evaluation, PT Evaluation and treatment, Vestibular panel, with follow up instructions given to Mr. Grazia.

- **3/05/14**: PT: has been experiencing headaches and dizziness after MVA which resulted in concussion. He was seen in the ER and also has physical therapy for one week for his neck. He had an episode of vertigo at the airport when trying to return to CT and was given medication. He was able to come home the next day. He had a few more bouts with dizziness since but has not had to take meds since Dec. - had some dizziness in the dental chair yesterday. He is a film producer and has not been working for a while but will be working in Las Vegas in a few weeks. He enjoys running and exercise and has not been able to do so since the accident. C/o headache at the top of the head 3-4/10 – 9/10. Neck stiffness/dizziness, decreased memory and Fatigue.
- **3/10/14**: Physical Therapy
- **3/12/14**: stability moderately reduced, 65.1%, high frequency hearing loss, bilaterally. ENG normal, headache got progressively worse throughout testing.
- **3/13/14**: Follow-up, last seen 2/7/14. He continues to get daily headaches, which are worse by the end of the day with a lot of cognitive activity. When he is fatigued, the dizziness returns and he is mildly nauseous. He has seen some improvement for his neck stiffness. He is still sensitive to bright light and loud noises. Intermittent numbness and tingling on right hand. New onset of tinnitus since the accident. Rx to continue cognitive and physical rest. He will be working in Nevada for the next 2-3 months and will not be back before June. He plans to find a physical therapist out there to continue his exercises for cervicalgia and headaches. He will take frequent breaks while working on set and go for a light walk. He will return in June for neuro testing for memory loss and follow-up shortly after.
- **3/14/14**: Unable to attend physical therapy appointment because an ENG yesterday induced vertigo which persisted into the next day and no one was available to drive him to the appointment.
- **4/9/14**: He is out in Nevada and cannot return to physical therapy, but he has not found a physical therapy in the area that does the same type of therapy we do here.
- **6/09/14**: Neopsychological Examination: patient is 51 yrs. old, married right hand dominate who sustained a concussion in a MVA on 11/16/13. Airbags were deployed and he was hit in the head by the rear seat air bag. He had severe neck pain immediately following the

June 27, 2017
Page 6

accident, unsure if he blacked out. He was taken to Harborview where he was diagnosed with a concussion. A CT of the head was reported as normal. After the accident, he experienced headaches on a daily basis. About 2 weeks ago he was in the airport and experienced an abrupt onset of nausea, vomiting and dizziness. He was taken to the ER and was given Rx meds. He has had episodes of vertigo since then. He also reports significant nightmares & disrupted sleep during the first few months after the MVA. He endorsed persisting symptoms. **He took a few months off after the accident.** He returned to work in March to work on a set in Nevada. (He is a freelance movie producer and director) he reported that it was more difficult for him to do his job secondary to post-concussive symptoms. He relied on his co-producer much more that he has in the past. He reports that his coworkers noticed cognitive changes. *He is worried about his ability to continue working in the same positon* in the future. His current position is very stressful, requiring him to manage 100-150 people and rapidly adjust to changing situations. Denied any history of concussion, head injury or psychological trauma prior to this accident. Denied prior history or depression, anxiety, psychosis or treatment. He holds a Bachelor of Arts degree relatively good student, mostly B's, he is dyslexic although this was never diagnosed during his schooling.  Married with 4 children span 13-20.

- **Decreased short term memory** – **repeating himself, not recalling details or important conversations, lowered frustration tolerance, interrupted sleep, depressed mood, less interest in previously pleasurable activities, increased tearfulness and constant headaches. Infrequent passing suicidal ideation but he denies intention or plan.**
- **Testing: became emotionally tearful during memory testing**. Results of Neuro testing cannot be validly interpreted because of suboptimal levels of effort and attention**. Testing revealed that his significant level of depression and anxiety is affecting his functional cognitive abilities**. It is likely that his chronic pain and spy stressors are also exacerbating any cognitive symptoms.
- Feel that he needs to initiate mental health treatment for his significant depression and anxiety in the context of post-concussive syndrome. Behavioral medicine intervention for headache.

On June 17, 2014, Mr. Grazia reported persistent headaches; although dizziness has resolved. Intermittent memory loss but acknowledges being under stress. Review of June 9, 2014 neurological evaluation demonstrated results that revealed variable attention/effort likely secondary to psychological interference. There is evidence of significant depression and anxiety. Behavioral medical intervention is highly recommended. Diagnosed with headache and post-concussion syndrome.

### DIAGNOSTIC/ICD 9 CODES

1. 850.9    Concussion, Unspecific
2. 784.0    Headache, Facial Pain, Pain in Head NOS
3. 780.4    Dizziness or Giddiness-Light Headedness
4. 780.93   Memory Loss
5. 386.50   Labyrinthine Dysfunction Unspecified
6. 388.30   Tinnitus (Aurium)
7. 310.20   Postconcussion Syndrome

June 27, 2017
Page 7

## A. ECONOMIC DAMAGES

Mr. Grazia followed his doctor's orders and took care of himself the best he could. Medical bills were incurred as a direct result of this motor vehicle collision. Mr. Grazia is continuing to treat in follow-up evaluations. Presently, past medical bills are itemized as follows:

| MEDICAL PROVIDER TOTALS | |
| --- | --- |
| **PROVIDER** | **AMOUNT** |
| Seattle Fire Department | 00.00 |
| America Medical Response | $960.29 |
| Harborview Medical Center ER | $4,004.01 |
| UW Physicians (Harborview) | $1,350.50 |
| The Everett Clinic | $229.75 |
| Harborview Medical Center | $4,422.23 |
| TRIMED Ambulance | $941.05 |
| Highline Medical Center | $3,126.31 |
| Highline ER Physicians | $542.85 |
| Western CT Medical Group | $889.00 |
| Associated Neurologists, P.C. | $7,367.00 |
| **TOTAL** | 23,832.99 |

## WAGE LOSS & LOSS OF EARNING CAPACITY

Mr. Grazia took a few months off after the accident. He returned to work in March to work on a set in Nevada, as a freelance movie producer and director. Mr. Grazia came to realize that it was more difficult for him to do his job secondary to post-concussive symptoms. He was forced to rely on his co-producer much more that he has in the past. Mr. Grazia's cognitive changes were so severe his co-workers were able to notice. His career is very stressful, requiring him to manage 100-150 people and rapidly adjust to changing situations.

June 27, 2017
Page 8

Mr. Grazia has been unable to work in the same capacity as a producer on any film since the accident. He is restricted in his ability to take all work that is offered to him. Mr. Grazia had to take work as a producer when he had a co-producer working with him to help with his memory issues he used to be able to perform before on his own before the accident. This severely impacts his career. Mr. Grazia has been limited in his capacity to further his career given these limitations. It might also end his career should he be unable to find work due to his need for assistance in completing his duties. Work as a producer is highly specialized and requires a good working memory, the ability to multi-task, work very long hours, retain precise information, facts, figures, and deal with people requiring patience, memory, ability to focus and concentrate and remain calm. This accident has deeply affected Mr. Grazia's memory, and the headaches and constant ringing in his ears makes it hard to carry on conversations and deal with issues that arise during film production. Trying to work long hours is impossible for Mr. Grazia to endure. Mr. Grazia had to leave the set several times a day to get away from the noise, workload and pressure – something he never had to do before. Doing this jeopardized his job and could end his career as a producer.

The financial estimate of future loss and damage to Mr. Grazia's business has not yet been calculated, but an estimate is set forth below.

## Future Loss (Present Value)

**Present Value:    $1,554,970**

| | | | |
|---|---|---|---|
| Annual Deficit: | $120,000.00 | Date of Birth: | Mar 10, 1963 |
| Discount Rate: | 1.00% | Date of Valuation: | Apr 5, 2017 |
| Growth Rate: | 5.00% | Date of Calculation: | Apr 25, 2017 |
| Gender: | Male | Ending Age: | 65 |
| Working Life Expectancy: | Yes | Education Level: | University degree |
| Include Mortality Adjustment: | Yes | | |

### B. NON- ECONOMIC DAMAGES

Because of the injury to the brain, Mr. Grazia's entire body has been affected. Mr. Grazia has suffered from daily, constant, debilitating headaches, ringing in the ears, inability to retain information, working memory loss, short term memory loss, nightmares, emotional trauma and mental anguish from damage to his ability to perform his job as a producer and director to the full and independent capacity spent with his family and inability to participate in family activities/events such as his daughter's track meets (very competitive level), high school graduation and family celebrations due to noise level causing severe pain in the head.

Mr. Grazia led an active lifestyle. Family is at the center of his life.

June 27, 2017
Page 9



June 27, 2017
Page 10



The activities of living that have been taken away or diminished for Mr. Grazia by the injuries sustained as a result of this severe collision of November 16, 2013. Tony's children feel like they have lost the father they always knew, and that he has been missing at many important milestones in their lives, including watching his daughters compete collegiately.

Tony's wife had to increase her work hours, now working full time, which takes away from her attendance to their youngest daughter who has significant learning challenges and requires the aid of her mother for her education.

June 27, 2017
Page 11


Tony Grazia took pride in his career.  But the most important aspect is that he was able to provide a comfortable lifestyle for his family.  Now, his career is different. He is unsure of his future career in this industry and of his involvement in the moving production business.


The following lists some of the projects he has attempted and difficulties Tony faced in trying to save his career in the competitive film industry.


**Fall 2013  "The Architect"  Working as Line Producer when accident occurred in November.**  As a result of accident:

- severe concussion
- dizziness
- vertigo and vomiting resulting in 2 trips to ER (once from airport restroom where he had collapsed from it and was unable get up)  Missed flight, ambulance to ER
- constant painful headaches
- constant loud ringing in his ears
- trauma resulting in nightmares and increased anxiety/stress
- damage to short term memory; inability to remember information which directly impacted his job as a producer
- sensitivity to light, noise, regular voices
- inability to focus for any length of time
- inability to work the hours necessary for his job as a producer
- co-producer aided Tony in finishing the film; allowing him to take frequent, long breaks, go back to hotel to sleep in dark room with no noise, covered for him so no one knew the extent to which he was no longer able to perform the simplest aspects of his job
- accident occurred right when Tony's desirability as a producer was on the rise; had to continue working in order to remain a viable, employable film producer
- inability to participate in any family functions including family get-togethers, track meets for his highly competitive daughters, school functions; loss of quality of life for himself and family


**2014  "Lake Mead"  Line Producer**
- symptoms of concussion continue with same degree of severity
- constant headaches
- sensitivity to light, noise, stress
- constant loud ringing in his ears
- inability to work hours necessary for his job as a producer
- vertigo, dizziness, vomiting
- sleep problems, unable to sleep more than a couple hours at a time

June 27, 2017
Page 12

- damage to short term memory; inability to remember information which directly impacted his job as a producer
- co-producer aided Tony in working on the film; allowing him to take frequent, long breaks, go back to hotel to sleep in dark room with no noise, covered for him so no one knew the extent to which he was no longer able to perform the simplest aspects of his job
- inability to participate in any family functions including family get-togethers, track meets for his highly competitive daughters, school functions; loss of quality of life for himself and family
- inability to attend his daughter's graduation longer than 5-10 minutes due to sensitivity and pain from noise, lighting, crowd
- continued symptoms of trauma from the accident: nightmares, fears, stress, anxiety
- personality change: no longer enjoyed social events and being around people; kept to himself; spent great deal of time alone in a dark room to manage pain from accident; distanced himself from his own family
- anxiety and stress over fear of losing career and financial means to support his family, as he is the main financial provider
- fear his children would have to leave college due to our inability to finance their education due to Tony's inability to work in the same capacity as before the accident

## 2014 "Disappointments Room"  Line Producer

- symptoms of concussion continue with same degree of severity
- constant headaches
- sensitivity to light, noise, stress
- constant loud ringing in his ears
- inability to work hours necessary for his job as a producer
- vertigo and dizziness
- sleep problems, unable to sleep more than a couple hours at a time
- damage to short term memory; inability to remember information which directly impacted his job as a producer
- co-producer aided Tony in working on the film; allowing him to take frequent, long breaks, go back to hotel to sleep in dark room with no noise, covered for him so no one knew the extent to which he was no longer able to perform the simplest aspects of his job
- inability to participate in any family functions including family get-togethers, track meets for his highly competitive daughters, school functions; loss of quality of life for himself and family
- continued symptoms of trauma from the accident: nightmares, fears, stress, anxiety
- personality change: no longer enjoyed social events and being around people; kept to himself; spent great deal of time alone in a dark room to manage pain from accident; distanced himself from his own family
- anxiety and stress over fear of losing career and financial means to support his family, as he is the main financial provider

June 27, 2017
Page 13

- fear his children would have to leave college due to our inability to finance their education due to Tony's inability to work in the same capacity as before the accident

"Disappointments Room" was the last film that Tony was able to produce. His injuries from the accident had become so overwhelming that he had to take less demanding work and work that was shorter in duration. He suffered from a continuation in intensity of all the above symptoms, and as a result, fell into many states of depression over the course of the next two years (2015 and 2016) as his career suffered, his health suffered, and his relationship with his family suffered.

Tony insolated himself due to the pain, and spent most of his time alone. While his two daughters completed their high school running careers (national level runners) and high school graduations, Tony either could not attend, or his attendance was so brief that his family felt like he was not present at all.

Tony had always been an extrovert: extremely social, fun-loving, "up for anything" personality and always the "life of the party." Following the head trauma, his personality changed dramatically. He became introverted, removed from his family and friends, no longer enjoyed attending parties, events, and family gatherings. Tony also has to sleep with a television on to drown out the ringing in his ears — thus he began sleeping in a separate room from his wife of over 20 years. This affected their marriage and their bond as a couple.

Tony had been a lifelong baseball fan, and sports fan, and following the accident, he no longer found joy in either participating or spectating sports. Tony gained 35 pounds due to his head trauma making it impossible for him to exercise due to painful headaches, constant ringing in his ears, and vertigo.

Tony struggled to complete any work as a producer independently, and had to rely either on a co-producer to help him through a job that before the accident he easily completed. His wife also helped him with prepping for jobs, helping him read through interviews, scripts, make notes, and anything else to aid him in the performance of his job.

While Tony could not publicly make it known that he was suffering these problems because it would cause irreversible damage to his career and reputation as a competent producer, he did have to pass on a film in order to try to heal from these life-altering injuries. As he stepped away from the film industry, less work came to him, and now he is struggling to get a job producing another film.

Despite trying to rebuild his career, as evidenced in 2016, his income has been negatively impacted. The accident occurred while Tony was on his way to becoming a very sought-after producer, and although he did have 2 films following the accident, this was because those films were already awarded to Tony prior – and his co-producer Pat Peach covered for Tony's diminished capacity as a producer in order to keep Tony on these films and making money for his family. Without Tony's financial contribution, his family would have lost their home and

June 27, 2017
Page 14

their college-age children would most likely have had to drop out of school due to the high cost of tuition.

Even in 2017, while some of Tony's symptoms had improved, he still battles headaches, ringing in the ears, the inability to sleep in the same room as his wife, limited time attending events in noisy or bright locations, and short term memory loss.

Mr. Grazia is a fascinating person, who is honest, kind, and believable. The jury will relate to him and will compensate him fairly. Non-economic damages are likely to be awarded as follows.

| | |
|---|---|
| Disability (past and future): | $  250,000 |
| Disfigurement: | $    25,000 |
| Pain and Suffering: | $  200,000 |
| Loss of Enjoyment of Life: | $  500,000 |

**TOTAL NON-ECONOMIC DAMAGES**     **$1,000,000**

### CONCLUSION

Tony Grazia's life is forever altered and changed as a result of a 22-year old girl's decision to recklessly drive drunk into oncoming traffic on a major highway one night. While she is able to live her life fully with no negative physical ailments from that night, she all but destroyed Tony's life and that of his family. She paid a small price for hurting Tony and his family so deeply.

For years and years, Tony and Karen Grazia have paid premiums for insurance coverage from SAFECO. Now, they need the benefit of the underinsured motorist coverage they paid for.

We would greatly appreciate exploring settlement opportunities promptly in this case.

Thank you for your assistance in this matter. We would like to see Mr. Grazia properly compensated adequately for his significant losses.

Very Truly,

HARDWICK & PENDERGAST

Doug Weinmaster

DW/dlw
Encl.

EXHIBIT E

# AFFIDAVIT

State of Indiana

County of Hamilton

NAME OF INSURED:        ANTHONY GRAZIA
                       KAREN A GRAZIA

POLICY NUMBER:         K2084427

POLICY DATES:          11-15-2013 TO 11-15-2014

David Hager being duly sworn on oath says he is an archivist of

SAFECO Insurance Company of Illinois  and that he has compared the

attached the insurance policy number listed above and endorsements with

the original records of the policy of insurance and endorsements

contained in the Company's files and that the same is a true and exact

recital of all the provisions in the said original policy and endorsements

attached thereto.

_David Hager_

Subscribed and sworn to before me

On March 2, 2016

_Cynthia A Potter_
Notary Public

Cynthia A. Potter
Notary Public, State of Indiana
SEAL
Marion County
Commission # 679251
My Commission Expires
February 1, 2024



Safeco Insurance™
Member of Liberty Mutual Group

# CONNECTICUT PERSONAL AUTO POLICY

SAFECO INSURANCE COMPANY OF ILLINOIS
Home Office: 2800 W. Higgins Rd., Suite 1100, Hoffman Estates, Illinois 60195

(A stock insurance company.)

## READY REFERENCE TO YOUR AUTO POLICY

|  | Beginning On Page |
|---|---|
| **AGREEMENT** | 1 |
| **DEFINITIONS** | 1 |
| **PART A — LIABILITY COVERAGE** | 3 |
| Insuring Agreement | |
| Supplementary Payments | |
| Exclusions | |
| Limit of Liability | |
| Out of State Coverage | |
| Financial Responsibility | |
| Other Insurance | |
| **PART B1 — BASIC REPARATIONS BENEFITS COVERAGE** | 6 |
| Definitions | |
| Insuring Agreement | |
| Exclusions | |
| Limit of Liability | |
| Duties After an Accident | |
| General Provisions | |
| **PART B2 — MEDICAL PAYMENTS COVERAGE** | 9 |
| Insuring Agreement | |
| Exclusions | |
| Limit of Liability | |
| Other Insurance | |
| **PART C — UNINSURED/UNDERINSURED MOTORISTS COVERAGE** | 11 |
| Insuring Agreement | |
| Exclusions | |
| Limit of Liability | |
| Other Insurance | |
| **PART D — COVERAGE FOR DAMAGE TO YOUR AUTO** | 14 |
| Insuring Agreement | |
| Transportation Expenses | |
| Exclusions | |
| Limit of Liability | |
| Payment of Loss | |
| No Benefit to Bailee | |
| Other Sources of Recovery | |
| Appraisal | |
| **PART E — DUTIES AFTER AN ACCIDENT OR LOSS** | 18 |
| **PART F — GENERAL PROVISIONS** | 19 |
| Policy Period and Territory | |
| Changes | |
| Termination | |
| Two or More Autos Insured; Two or More Auto Policies | |

1803



SA-1852/CTEP 11/09

## AGREEMENT

In return for your payment of all premiums, and in reliance upon the statements in the application we agree to insure you subject to the terms, conditions and limitations of this policy. We will insure you for the coverages and limits shown on the Declarations. Your policy consists of the policy contract, Declarations and endorsements applicable to the policy.

## DEFINITIONS

**A.** Throughout this policy, "you" and "your" refer to:

1. The "named insured" shown in the Declarations;

2. The spouse if a resident of the same household;

3. The civil partner, if a resident of the same household, by civil union recognized by Connecticut law; or

4. The **domestic partner,** if a resident of the same household;

   **"Domestic partner"** means a person living as a continuing partner with you and:

   **(a)** is at least 18 years of age and competent to contract;

   **(b)** is not a relative; and

   **(c)** shares with you the responsibility for each other's welfare, evidence of which includes:

   **(1)** the sharing in domestic responsibilities for the maintenance of the household; or

   **(2)** having joint financial obligations, resources, or assets; or

   **(3)** one with whom you have made a declaration of domestic partnership or similar declaration with an employer or government entity.

   **Domestic partner** does not include more than one person, a roommate whether sharing expenses equally or not, or one who pays rent to the named insured.

**B.** "We," "us" and "our" refer to the Company, as shown in the Declarations providing this insurance.

**C.** For purposes of this policy, a private passenger auto shall be deemed to be owned by a person if leased:

1. Under a written agreement to that person; and

2. For a continuous period of at least six months.

**D.** Throughout the policy, **"minimum limits"** refers to the following limits of liability required by Connecticut law to be provided under a policy of automobile liability insurance:

1. $20,000 for each person, subject to $40,000 for each accident, with respect to **bodily injury;**

2. $10,000 for each accident with respect to **property damage.**

Other words and phrases are defined. They are in bold type when used.

**E.** **"Bodily injury"** means bodily harm, sickness or disease, including death that results.

**F.** **"Business"** includes trade, profession or occupation.

**G.** **"Family member"** means a person related to you by blood, marriage, civil union, domestic partnership or adoption who is a resident of your household. This includes a ward or foster child who is a resident of your household.

However, **family member** does not include a **family member,** or **family member's** spouse, who owns an auto not insured under this policy, when not **occupying** an auto insured under this policy.

**H.** **"Fungi"** means any type or form of fungus, including yeast, mold or mildew, blight or mushroom and any mycotoxins, spore, scents or other substances, products or byproducts produced, released by or arising out of **fungi,** including growth, proliferation or spread of **fungi** or the current or past presence of **fungi.** However, this definition does not include any **fungi** intended by the **insured** for consumption.

**I.** **"Occupying"** means in; upon; or getting in, on, out or off.

**J.** **"Property damage"** means physical injury or destruction of tangible property including loss of use.

**K.** **"Punitive or exemplary damages"** include damages which are awarded to punish or deter wrongful conduct, to set an example, to fine, penalize or impose a statutory penalty, and damages which are awarded for any purpose other than as compensatory damages for **bodily injury** or **property damage.**

**L.** **"Trailer"** means a vehicle designed to be pulled by a:

**1.** Private passenger auto; or

**2.** Pickup, **van** or motorhome.

It also means a recreational camping vehicle, a farm wagon or farm implement while towed by a vehicle listed in **L.1.** or **L.2.** above.

**M.** **"Your covered auto"** means:

**1.** Any vehicle shown in the Declarations.

**2.** **a.** Any newly acquired vehicle, whether operational or not, on the date you become the owner, subject to conditions for **Newly Acquired Replacement Vehicle** and **Newly Acquired Additional Vehicle** under **M.2.b.** below. Any newly acquired vehicle must be of the following types:

    **(1)** a private passenger auto;

    **(2)** a pickup or van that:

        **(a)** has a Gross Vehicle Weight Rating of 12,000 lbs or less; and

        **(b)** is not used for the delivery or transportation of goods and materials unless such use is:

            **i.** incidental to your **business** of installing, maintaining or repairing furnishings or equipment; or

            **ii.** for farming or ranching; or

    **(3)** a motorhome or **trailer.**

**b.** A newly acquired vehicle is subject to the following conditions:

    **(1)** **Newly Acquired Replacement Vehicle.** If the vehicle you acquire replaces one shown in the Declarations, the replacement vehicle will have the same coverage as the vehicle it replaced, other than Part **D** — Coverage for Damage to Your Auto. This provision applies only if there is no other insurance policy that provides coverage for that replacement vehicle.

    Part **D**—Coverage for Damage to Your Auto shall apply for the first thirty (30) days after you acquire the vehicle, including the date of acquisition, only to the extent Part **D** — Coverage for Damage to Your Auto applied to the vehicle being replaced. You must notify us within thirty (30) days after you acquire the replacement vehicle for Part **D** —Coverage for Damage to Your Auto to continue.

    **(2)** **Newly Acquired Additional Vehicle.** For any newly acquired vehicle that is in addition to any shown in the Declarations coverage shall apply for the first thirty (30) days after you acquire the vehicle, including the date of acquisition. Coverage shall be the broadest coverage we provide for any vehicle shown in the Declarations. This coverage applies only if:

        **(a)** you acquire the additional vehicle during the policy period shown on the Declarations; and

        **(b)** there is no other insurance policy that provides coverage for the additional vehicle.

    If you wish to add or continue coverage you must ask us to insure the additional vehicle within thirty (30) days after you acquire the additional vehicle. This thirty (30) days of coverage includes the day you acquire the vehicle.

    **(3)** Collision Coverage for a newly acquired vehicle begins on the date that you acquire the vehicle. However, if the Declarations does not indicate that Collision Coverage applies to at least one vehicle, you must ask us to insure the newly acquired vehicle within four (4) days after you acquire it. If a loss occurs during the four (4) days after you acquire the vehicle but before you asked us to insure the newly acquired vehicle, a $500 collision deductible will apply.

    **(4)** Comprehensive Coverage for a newly acquired vehicle begins on the date that you acquire the vehicle. However, if the Declarations does not indicate that Comprehensive Coverage applies to at least one vehicle, you must ask us to insure the newly acquired vehicle within

four (4) days after you acquire it. If a loss occurs during the four (4) days after you acquire the vehicle but before you asked us to insure the newly acquired vehicle, a $500 comprehensive deductible will apply.

3. Any auto or **trailer** you do not own while used as a temporary substitute for any

other vehicle described in this definition which is out of normal use because of its:

a. breakdown;

b. repair;

c. servicing;

d. loss; or

e. destruction.

This provision **(M.3.)** does not apply to Coverage for Damage to Your Auto.

## PART A — LIABILITY COVERAGE

### INSURING AGREEMENT

A. We will pay damages for **bodily injury** or **property damage** for which any **insured** becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for **bodily injury** or **property damage** not covered under this policy.

B. "Insured" as used in this Part means:

1. You or any **family member** for the ownership, maintenance or use of any auto or **trailer.**

2. Any person using **your covered auto** with your express or implied permission. The actual use must be within the scope of that permission.

3. For **your covered auto,** any person or organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under **B.1.** and **B.2.** above.

4. For any auto or **trailer,** other than **your covered auto,** any other person or organization but only with respect to legal responsibility for acts or omissions of you or any **family member** for whom coverage is afforded under this Part. This provision **(B.4.)** applies only if the person or organization does not own or hire the auto or **trailer.**

### INTEREST ON JUDGMENTS

In addition to our limit of liability, we will pay interest on judgments subject to all of the following:

1. Any notice, demand, summons, judgment, or any process has been promptly forwarded to us as required by the policy conditions.

2. We accept the defense or agree to the judgment.

3. We will pay the interest on that part of the judgment that is covered.

4. We will pay interest that accrues after entry of judgment and before we pay, tender, or deposit in court.

5. If we appeal the judgment, we will pay interest on the entire judgment.

### SUPPLEMENTARY PAYMENTS

We will pay on behalf of an **insured:**

1. Up to $1,000 for the cost of bail bonds required because of an accident, including related traffic law violations. We are not obligated to apply for or furnish such bonds.

2. Premiums on appeal bonds and bonds to release attachments in any suit we defend.

3. Up to $250 a day for loss of earnings, but not other income, because of attendance at hearings or trials at our request.

4. Other reasonable expenses incurred at our request.

5. Arrange upon your request, for the issuance of a bond to release an attachment. However, the amount of the bond will not be greater than the limits of liability for Liability Coverage.

6. Pay all expenses incurred by an **insured** for first aid to others at the time of the accident.

### EXCLUSIONS

A. We do not provide Liability Coverage for:

1. Any **insured** who intentionally causes **bodily injury** or **property damage** even if such **bodily injury** or **property damage** is of a different kind or degree than expected or intended, or such **bodily injury** or **property damage** is sustained by a different person or persons than expected or intended.



**2.** **Property damage** to property owned or being transported by any **insured.**

**3.** **Property damage** to property:

    **a.** rented to;

    **b.** used by; or

    **c.** in the care of;

any **insured.**

This exclusion **(A.3.)** does not apply to **property damage** to a residence or private garage.

**4.** **Bodily injury** to an employee of any **insured** during the course of employment. This exclusion **(A.4.)** does not apply to **bodily injury** to a domestic employee unless workers compensation benefits are required or available for that domestic employee.

**5.** Any **insured's** liability arising out of the ownership or operation of a vehicle while it is being used as a public or livery conveyance. This exclusion **(A.5.)** does not apply to a share-the-expense car pool.

**6.** Any **insured's** liability arising out of the ownership or operation of a vehicle while it is being used for carrying property for the purpose of compensation.

**7.** **a.** Any **insured** while employed or otherwise engaged in the **business** of:

      **(1)** selling;

      **(2)** repairing;

      **(3)** servicing;

      **(4)** storing; or

      **(5)** parking;

    vehicles designed for use mainly on public highways. This includes road testing and delivery.

    **b.** This exclusion **(A.7.)** does not apply to the ownership, maintenance or use of **your covered auto** by:

      **(1)** you;

      **(2)** any **family member;** or

      **(3)** any partner, agent or employee of you or any **family member.**

**8.** Any **insured** maintaining or using any vehicle while that **insured** is employed or otherwise engaged in any **business** (other than farming or ranching) not described in exclusions **A.6.** or **A.7.** This exclusion **(A.8.)** does not apply to the maintenance or use of a:

**a.** private passenger auto;

**b.** pickup, motorhome or van that:

    **(1)** you own; or

    **(2)** you do not own while used as a temporary substitute for **your covered auto** which is out of normal use because of its:

      **(a)** breakdown;

      **(b)** repair;

      **(c)** servicing;

      **(d)** loss; or

      **(e)** destruction; or

**c.** **trailer** used with a vehicle described in **A.8.a.** or **A.8.b.** above.

**9.** Any **insured** using a vehicle without the express or implied permission of the owner or other person having lawful possession, or using a vehicle beyond the scope of the permission granted. However, this exclusion does not apply to a **family member** using **your covered auto.**

**10.** **a.** **Bodily injury** or **property damage** for which any **insured:**

      **(1)** is an **insured** under a nuclear energy liability policy; or

      **(2)** would be an **insured** under a nuclear energy liability policy but for its termination upon exhaustion of its limit of liability.

    **b.** A nuclear energy liability policy is a policy issued by any of the following or their successors:

      **(1)** Nuclear Energy Liability Insurance Association;

      **(2)** Mutual Atomic Energy Liability Underwriters; or

      **(3)** Nuclear Insurance Association of Canada.

**11.** **Punitive or exemplary damages** awarded against any **insured.**

**12.** **Bodily injury** or **property damage** arising out of the use of **your covered auto** while rented to others. However, this exclusion does not apply to the operation of **your covered auto** by you or a **family member.**

**B.** We do not provide Liability Coverage for the ownership, maintenance or use of:

    **1.** **a.** Any vehicle which:

      **(1)** has fewer than four wheels;

      **(2)** is designed mainly for use off public roads; or

1885X

**(3)** is a vehicle not licensed for use on public roads.

**b.** This exclusion does not apply:

  **(1)** while such vehicle is being used by an **insured** in a medical emergency; or

  **(2)** to any **trailer.**

**2.** Any vehicle, other than **your covered auto,** which is:

**a.** owned by you; or

**b.** furnished or available for your regular use.

**3. a.** Any vehicle, other than **your covered auto,** which is:

  **(1)** owned by any **family member** or other person who resides with you; or

  **(2)** furnished or available for the regular use of any **family member** or other person who resides with you.

**b.** However, this exclusion **(B.3.)** does not apply to you while you are maintaining or **occupying** any vehicle which is:

  **(1)** owned by a **family member** or other person who resides with you; or

  **(2)** furnished or available for the regular use of a **family member** or other person who resides with you.

**4.** Any vehicle while it is:

**a.** operating on a surface designed or used for racing, except for an organized and controlled event that is not a speed, performance, stunt or demolition event;

**b.** participating in a high performance driving or racing instruction course or school; or

**c.** preparing for, practicing for, used in, or competing in any prearranged or organized:

  **(1)** race activity; or

  **(2)** speed, performance, stunt, or demolition contest or exhibition.

## LIMIT OF LIABILITY

**A.** If the Declarations indicates "per person"/"per accident" coverage applies:

The limit of liability as shown in the Declarations for "each person" for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care and loss of services (including loss of consortium and wrongful death), arising out of **bodily injury** sustained by any one person in any one auto accident.

Subject to this limit for "each person," the limit of liability shown in the Declarations for "each accident" for Bodily Injury Liability is our maximum limit of liability for all damages for **bodily injury** resulting from any one auto accident.

The limit of liability shown in the Declarations for each accident for Property Damage Liability is our maximum limit of liability for all **property damage** resulting from any one accident.

This is the most we will pay regardless of the number of:

**1. Insureds;**

**2.** Claims made;

**3.** Vehicles or premiums shown in the Declarations; or

**4.** Vehicles involved in the auto accident.

**B.** If the Declarations indicate **Combined Single Limit** applies, Paragraph **A.** above is replaced by the following:

The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one auto accident. This is the most we will pay regardless of the number of:

**1. Insureds;**

**2.** Claims made;

**3.** Vehicles or premiums shown in the Declarations; or

**4.** Vehicles involved in the auto accident.

We will apply the limit of liability to provide any separate limits required by law for **bodily injury** and **property damage** liability. However, this provision will not change our total limit of liability.

**C.** No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and Part **C** of this policy or any Medical Payments coverage.

**D.** A vehicle and attached trailer are considered one vehicle. Therefore the limits of liability will not be increased for an accident involving a vehicle which has an attached trailer.

## OUT OF STATE COVERAGE

If an auto accident to which this policy applies occurs in any state or province other than the one in which **your covered auto** is principally garaged, we will interpret your policy for that accident as follows:

**A.** If the state or province has:

**1.** A financial responsibility or similar law specifying limits of liability for **bodily injury**

or **property damage** higher than the limit shown in the Declarations, your policy will provide the higher specified limit.

2. A compulsory insurance or similar law requiring a nonresident to maintain insurance whenever the nonresident uses a vehicle in that state or province, your policy will provide at least the required **minimum limits** and types of coverage.

B. No one will be entitled to duplicate payments for the same elements of loss.

### FINANCIAL RESPONSIBILITY

When this policy is certified as future proof of financial responsibility, this policy shall comply with the law to the extent required.

### OTHER INSURANCE

A. If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits.

B. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance unless it is a vehicle insured under a policy affording coverage to an **insured** engaged in the **business** of selling or repairing motor vehicles. If this occurs and the accident arises out of the operation of such vehicle by you or a **family member** who is neither the person engaged in such **business** nor such person's employee or agent, we will provide primary insurance.

## PART B1 — BASIC REPARATIONS BENEFITS COVERAGE

### SCHEDULE

| Benefits | Limit of Liability |
|---|---|
| Maximum Aggregate Limit | Our maximum limit of liability for all benefits is $5,000 subject to the following limits for specific benefits: |
| Medical Expense Benefits | No specific dollar amount. |
| Funeral Expense Benefits | Up to $2,000. |
| Work Loss Benefits and Survivor's Loss Benefits | Up to $200 for any week. |

### DEFINITIONS

A. **"Auto"** means a land motor vehicle or trailer. However, **"auto"** does not include:

1. A vehicle operated on rails or crawler treads;

2. A vehicle or trailer while located for use as a residence or premises; or

3. A farm type tractor or other equipment designed for use principally off public roads, while not upon public roads.

B. **"Insured,"** as used in this coverage, means:

1. You or any **family member** injured in an **auto** accident:

   a. while **occupying** an **auto.** However, you and any **family member** are not covered while **occupying** a motorcycle;

   b. as a pedestrian, when struck by an **auto.**

2. Anyone else injured in an **auto** accident:

   a. while **occupying your covered auto** with your express or implied permission. The actual use must be within the scope of that permission; or

   b. while **occupying** any other **auto** operated by:

      (1) you; or

      (2) any **family member.**

      The **auto** cannot be a motorcycle, or any other vehicle while used as a public or livery conveyance.

   c. as a pedestrian when struck by **your covered auto.**

C. **"Private passenger auto"** means an auto of the:

1. Private passenger, station wagon or camper type.

2. Truck type with a load capacity of 1500 pounds or less which is:

   a. registered as a passenger motor vehicle or a passenger and commercial motor vehicle as defined in Connecticut Motor Vehicle Laws; or

   b. used for farming.

3. High mileage motor vehicle type having the following characteristics:

   a. no less than 3 wheels;

**b.** a driver's seat completely enclosed;

**c.** a 1 or 2 cylinder, gas or diesel engine, or an electric motor; and

**d.** efficient fuel consumption.

However, **"private passenger auto"** does not include a motorcycle, or any other vehicle while used as a public or livery conveyance.

**D.** **"Usual and customary charges"** as used in this Part mean:

Any amount which we determine represents a customary charge for services in the geographic area in which the service is rendered. To determine whether a charge is customary, we may consider outside source of information of our choice, including, but not limited to:

**1.** Licensed, certified or registered health care professionals;

**2.** Medical examinations;

**3.** Medical file renews;

**4.** Medical bill renew services; or

**5.** Computerized data bases.

The **insured** shall not be responsible for payment of any medication applied by us. If a medical provider disputes an amount paid by us, we will be responsible for resolving such disputes.

**E.** **"Your covered auto,"** as used in this coverage, means a **private passenger auto:**

**1.** For which a premium is shown in the Declaration for this coverage; and

**2.** To which Bodily Injury Liability Coverage under this policy applies.

**INSURING AGREEMENT**

**A.** We will pay Basic Reparations Benefits to or for:

**1.** An **insured** who sustains **bodily injury;** or

**2.** That **insured's** survivors.

The **bodily injury** must:

**1.** Be caused by an accident; and

**2.** Result from the:

**a.** ownership;

**b.** maintenance; or

**c.** use (including loading and unloading);

of an **auto** as an **auto.**

We have a right to renew medical expenses and services to determine if they are reasonable and necessary for the **bodily injury** sustained.

**B.** Subject to the limits shown in the Schedule the benefits consist of the following:

**1.** **Medical Expenses.** Necessary, **usual and customary charges** for reasonable medical expenses which include necessary products, services and accommodations used for an **insured's:**

**a.** care;

**b.** recovery; or

**c.** rehabilitation.

Only semiprivate hospital room charges will be paid unless special or intensive care is required.

**2.** **Funeral Expenses.** Reasonable funeral or burial expenses incurred.

**3.** **Work Loss** consisting of:

**a.** **Income Loss.** 85% of the loss of income which an **insured** who would normally be employed in gainful activity would have earned except for the injury. If an **insured** was unemployed at the time of the accident, the equivalent of employment compensation benefits he or she would have been eligible to receive except for the injury. Any income an **insured** earns from substitute work or would have earned from available and appropriate substitute work he or she could have performed but did not, will be subtracted from the income benefits we will pay.

**b.** **Replacement Services.** 85% of expenses reasonably incurred to obtain ordinary and necessary services to replace those the **insured** would have performed for the benefit of the household except for the injury. The services cannot be obtained from members of the **insured's** household. In addition, the services cannot be obtained to produce income for the **insured.**

These benefits do not continue after an **insured** dies. We will prorate these benefits for any period of less than one week.

**4.** **Survivor's Loss Benefits** consisting of:

**a.** **Income Loss.** The contribution an **insured's** dependent survivors would have received for their support:

**(1)** out of income from work; or

**(2)** from unemployment compensation

from the **insured** had he or she not died.

**b.** **Replacement Services.** Expenses reasonably incurred by an **insured's**

 

dependent survivors to obtain ordinary and necessary services to replace those the **insured** would have performed for the benefit of the household had he or she not died. The services cannot be obtained from members of the deceased **insured's** household.

A dependent survivor is:

a. the surviving spouse, civil partner or domestic partner of a deceased **insured**; or

b. any other person who is, and as long as that person is:

    (1) under 18 years old; or

    (2) physically or mentally unable to earn a living; or

    (3) in a full-time formal program of academic or vocational education or training.

    To qualify as a dependent survivor, a person who qualifies under the above listing must have, at the time of death:

        (a) received support from the deceased **insured**; and

        (b) qualified as a dependent of the deceased **insured** for federal income tax purposes under the Internal Revenue Code.

## EXCLUSIONS

We do not provide Basic Reparations Benefits Coverage for **bodily injury:**

1. To any **insured** who intentionally causes or attempts to cause **bodily injury** to:

    a. himself or herself. This includes survivors' loss benefits to a dependent survivor of that person; and

    b. any other person.

2. Sustained by an **insured** using an **auto** stolen by that **insured.** This exclusion does not apply to:

    a. you; or

    b. any **family member.**

3. Sustained by any pedestrian if the accident occurs outside of Connecticut. This exclusion does not apply to:

    a. you; or

    b. any **family member.**

4. Sustained by you while **occupying** an **auto:**

a. for which you are required to provide security under Connecticut law; and

b. which is not **your covered auto.**

5. Sustained by any **insured** while **occupying** an **auto** owned by, or furnished or available for the regular use of:

    a. you; or

    b. any **family member.**

    This exclusion does not apply to a **private passenger auto.**

6. Sustained by any **insured** resulting from the ownership, maintenance or use of a parked auto unless:

    a. the **bodily injury** is sustained while the **insured** is **occupying** the **auto;**

    b. the **auto** is parked in a manner which would cause unreasonable risk of the **bodily injury;** or

    c. the **bodily injury** is the direct result of physical contact with:

        (1) equipment permanently mounted on the **auto** while the equipment is being operated or used; or

        (2) property being lifted or lowered from the **auto** in the loading or unloading process.

7. Caused by or as a consequence of:

    a. discharge of a nuclear weapon (even if accidental);

    b. war (declared or undeclared);

    c. civil war;

    d. insurrection; or

    e. rebellion or revolution.

8. From or as a consequence of the following, whether controlled or uncontrolled or however caused:

    a. nuclear reaction;

    b. radiation; or

    c. radioactive contamination.

9. Sustained while **occupying your covered auto** when it is being used as a public or livery conveyance. This exclusion **(9.)** does not apply to a share-the-expense car pool.

10. Occurring during the course of employment if workers compensation benefits are required or available for the **bodily injury.**

11. Sustained while **occupying** any vehicle while employed in the delivery of newspapers or magazines, food or any products for the purpose of compensation.

1687X

This exclusion does not apply to delivery that is incidental to an **insured's business.**

12. Sustained while **occupying** a vehicle without the express or implied permission of the owner or other person having lawful possession, or using a vehicle beyond the scope of the permission granted. However this exclusion does not apply to a **family member** using **your covered auto.**

13. Sustained while **occupying** a vehicle when it is being used in the **business** or occupation of an **insured.** This exclusion **(13.)** does not apply to **bodily injury** sustained while **occupying** a:

    a. **private passenger auto;**

    b. **pickup, van** or motor home that you own; or

    c. **trailer** used with a vehicle described in **a.** or **b.** above.

14. Sustained while **occupying** any vehicle while it is:

    a. operating on a surface designed or used for racing except for an organized and controlled event that is not a speed, performance, stunt or demolition event;

    b. participating in a high performance driving or racing instruction course or school; or

    c. preparing for, practicing for, used in, or competing in any prearranged or organized:

       (1) race activity; or

       (2) speed, performance, stunt, or demolition contest or exhibition.

15. Caused by the actual, alleged or threatened presence, growth, proliferation or spread of **fungi** or bacteria.

### LIMIT OF LIABILITY

The limit of liability shown in the Schedule for this coverage is our maximum limit of liability for each **insured** injured in any one **auto** accident. This is the most we will pay regardless of the number of:

1. Vehicles involved in the accident; or

2. Insurers providing reparations or medical payments benefits.

Any amount payable under this insurance shall be reduced by amounts paid, payable, or required to be provided:

1. Under any of the following or similar law:

   a. workers compensation law; or

   b. medical or disability benefits law (excluding Medicare); and

2. As direct benefits without regard to fault by an insurer (including a self-insurer) of any vehicle other than **your covered auto.** This does not apply to:

   a. you; or

   b. any **family member.**

### GENERAL PROVISIONS

#### Our Right To Recover Payment

Our rights are subject to any applicable limitations stated in the Connecticut Insurance Law.

### OTHER INSURANCE

A. No one shall be entitled to receive duplicate payments for the same elements of loss under this or any other insurance.

B. Any coverage we provide shall be primary only for **bodily injury** sustained by an **insured** in an accident arising out of the use or operation of **your covered auto.** Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage on a primary basis.

C. If an **insured** is entitled to reparations benefits coverage under more than one policy, the maximum amount payable under all of the policies shall not exceed the amount payable under the policy with the highest limit of liability. We will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits of policies providing coverage on the same basis.

### OTHER COVERAGES

Any amount payable for economic loss under Uninsured/Underinsured Motorists Coverage will be reduced by any basic reparations benefits:

1. Paid; or

2. Payable;

to an **insured** under this policy.

---

## PART B2 — MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

A. We will pay **usual and customary charges** incurred for reasonable and necessary medical and funeral expenses because of **bodily injury:**

1. Caused by accident; and

2. Sustained by an **insured.**

We will pay only those expenses incurred for services rendered within three (3) years from the date of the accident.

We have a right to review medical expenses and services to determine if they are reasonable and necessary for the **bodily injury** sustained.

**B.** **"Insured"** as used in this Part means:

1. You or any **family member:**

   **a.** while **occupying;** or

   **b.** as a pedestrian or bicyclist when struck by;

   a motor vehicle designed for use mainly on public roads or a **trailer** of any type.

2. Any other person while **occupying your covered auto** with your express or implied permission. The actual use must be within the scope of that permission.

3. Any other person while **occupying,** as a guest, an automobile not owned by you or a **family member,** while being operated by you or a **family member.**

**C.** **"Usual and customary charges"** as used in this Part mean:

Any amount which we determine represents a customary charge for services in the geographic area in which the service is rendered. To determine whether a charge is customary, we may consider outside sources of information of our choice, including, but not limited to:

1. Licensed, certified or registered health care professionals;

2. Medical examinations;

3. Medical file reviews;

4. Medical bill review services; or

5. Computerized data bases.

The **insured** shall not be responsible for payment of any reduction applied by us. If a medical provider disputes an amount paid by us, we will be responsible for resolving such disputes.

**EXCLUSIONS**

We do not provide Medical Payments Coverage for any **insured** for **bodily injury:**

1. Sustained while **occupying** any motorized vehicle having fewer than four wheels.

2. Sustained while **occupying your covered auto** when it is being used as a public or livery conveyance. This exclusion **(2.)** does not apply to a share-the-expense car pool.

3. Sustained while **occupying** any vehicle while it is being used for carrying property for the purpose of compensation.

4. Sustained while **occupying** any vehicle located for use as a residence or premises.

5. Occurring during the course of employment if workers compensation benefits are required or available for the **bodily injury.**

6. Sustained while **occupying,** or when struck by, any vehicle (other than **your covered auto**) which is:

   **a.** owned by you; or

   **b.** furnished or available for your regular use.

7. Sustained while **occupying,** or when struck by, any vehicle (other than **your covered auto**) which is:

   **a.** owned by any **family member** or other person who resides with you; or

   **b.** furnished or available for the regular use of any **family member** or other person who resides with you.

   However, this exclusion **(7.)** does not apply to you.

8. Sustained while **occupying** a vehicle without the express or implied permission of the owner or other person having lawful possession, or using a vehicle beyond the scope of the permission granted. However this exclusion does not apply to a **family member** using **your covered auto.**

9. Sustained while **occupying** a vehicle when it is being used in the **business** of an **insured.** This exclusion **(9.)** does not apply to **bodily injury** sustained while **occupying** a:

   **a.** private passenger auto;

   **b.** pickup, van or motorhome that you own; or

   **c.** **trailer** used with a vehicle described in **a.** or **b.** above.

10. Caused by or as a consequence of:

    **a.** discharge of a nuclear weapon (even if accidental);

    **b.** war (declared or undeclared);

    **c.** civil war;

    **d.** insurrection; or

    **e.** rebellion or revolution.

11. From or as a consequence of the following, whether controlled or uncontrolled or however caused:

    **a.** nuclear reaction;

    **b.** radiation; or

    **c.** radioactive contamination.

**12.** Sustained while **occupying** any vehicle while it is:

   **a.** operating on a surface designed or used for racing except for an organized and controlled event that is not a speed, performance, stunt or demolition event;

   **b.** participating in a high performance driving or racing instruction course or school; or

   **c.** preparing for, practicing for, used in, or competing in any prearranged or organized:

     (1) race activity; or

     (2) speed, performance, stunt, or demolition contest or exhibition.

## LIMIT OF LIABILITY

**A.** The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for each person injured in any one accident. This

is the most we will pay regardless of the number of:

   **1.** **Insureds;**

   **2.** Claims made;

   **3.** Vehicles or premiums shown in the Declarations; or

   **4.** Vehicles involved in the accident.

**B.** No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and Part **A** or Part **C** of this policy.

## OTHER INSURANCE

If there is other applicable auto medical payments insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own, including any vehicle while used as a temporary substitute for **your covered auto,** shall be excess over any other collectible auto insurance providing payments for medical or funeral expenses.

---

## PART C — UNINSURED/UNDERINSURED MOTORISTS COVERAGE

---

### INSURING AGREEMENT

**A.** We will pay damages which an **insured** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** or **underinsured motor vehicle** because of **bodily injury:**

   **1.** Sustained by that **insured;** and

   **2.** Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle** or **underinsured motor vehicle.**

We will pay under this coverage only after the limits of liability under any bodily injury liability bonds or policies applicable to the **underinsured motor vehicle** have been exhausted by payment of judgment or settlements.

Any judgment for damages arising out of suit brought without our written consent is not binding on us.

**B.** "**Insured**" as used in this Part means:

   **1.** You or any **family member.**

   **2.** Any Rated Driver shown on the Declarations other than you or a **family member.**

   **3.** Any other person **occupying your covered auto** with your express or implied permission. The actual use must be within the scope of that permission.

   **4.** Any person entitled to recover damages because of **bodily injury** to which this coverage applies sustained by a person described in **B.1., B.2.** or **B.3.** above.

**C.** "**Underinsured motor vehicle**" means a land motor vehicle or **trailer** of any type for which the sum of the limits of liability under all bodily injury bonds or policies applicable at the time of the accident is less than the limit of liability for this coverage.

However, "**underinsured motor vehicle**" does not include any vehicle or equipment:

   **1.** To which a liability bond or policy applies at the time of the accident but the bonding or insuring company;

     **a.** denies coverage; or

     **b.** is or becomes insolvent.

   **2.** Owned or operated by a self-insurer under any applicable motor vehicle law.

**D.** "**Uninsured motor vehicle**" means a land motor vehicle or **trailer** of any type:

   **1.** To which no bodily injury liability bond or policy applies at the time of the accident.

   **2.** Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits or which causes an accident resulting in **bodily injury** without hitting:

     **a.** you or any **family member;**

1608

**b.** a vehicle which you or any **family member** are **occupying;** or

**c. your covered auto.**

If there is no physical contact with the vehicle causing the accident, the **insured** must prove by a fair preponderance of the evidence that the injuries resulted from the negligence of an unidentified motorist.

**3.** To which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:

   **a.** denies coverage; or

   **b.** is or becomes insolvent.

However, **"uninsured motor vehicle"** does not include any vehicle or equipment owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer which is or becomes insolvent.

In addition, neither **"uninsured motor vehicle"** nor **"underinsured motor vehicle"** includes any vehicle or equipment:

**1.** Owned by or furnished or available for your regular use.

**2.** Owned by any governmental unit or agency.

**3.** Operated on rails or crawler treads.

**4.** Designed mainly for use off public roads while not upon public roads.

**5.** While located for use as a residence or premises.

**EXCLUSIONS**

**A.** We do not provide Uninsured/Underinsured Motorists Coverage for **bodily injury** sustained:

**1.** By an **insured** while **occupying,** or when struck by, any motor vehicle owned by that **insured** which is not insured for this coverage under this policy. This includes a **trailer** of any type used with that vehicle.

**2.** By any **family member** while **occupying,** or when struck by, any motor vehicle you own which is insured for this coverage on a primary basis under any other policy.

**B.** We do not provide Uninsured/Underinsured Motorists Coverage for **bodily injury** sustained by any **insured:**

**1.** If that **insured** or the legal representative settles the **bodily injury** claim without our consent.

**2.** While **occupying your covered auto** when it is being used as a public or livery conveyance. This exclusion **(B.2.)** does not apply to a share-the-expense car pool.

**3.** While using any vehicle while it is being used for carrying property for the purpose of compensation.

**4.** While using a vehicle without the express or implied permission of the owner or other person having lawful possession, or using a vehicle beyond the scope of the permission granted. However, this exclusion does not apply to you or any **family member** using **your covered auto.**

**C.** This coverage shall not apply directly or indirectly to benefit any insurer or self-insurer under any of the following or similar law:

**1.** Workers compensation law; or

**2.** Disability benefits law.

**D.** We do not provide Uninsured/Underinsured Motorists Coverage for **punitive or exemplary damages.**

**LIMIT OF LIABILITY**

**A.** The limit of liability shown in the Declarations for "each person" for Uninsured/Underinsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care and loss of services (including loss of consortium and wrongful death), arising out of **bodily injury** sustained by any one person in any one auto accident.

Subject to this limit for "each person", the limit of liability shown in the Declarations for "each accident" for Uninsured/Underinsured Motorists Coverage is our maximum limit of liability for all damages for **bodily injury** resulting from any one auto accident.

This is the most we will pay regardless of the number of:

**1. Insureds;**

**2.** Claims made;

**3.** Vehicles or premiums shown in the Declarations; or

**4.** Vehicles involved in the accident.

**B.** If the Declarations indicate Combined Single Limit Coverage applies, paragraph **(A.)** above is replaced by the following:

The limit of liability shown in the Declarations for Uninsured/Underinsured Motorists Coverage is our maximum limit of liability for all damages for **bodily injury** resulting from any one auto accident. This is the most we will pay regardless of the number of:

**1. Insureds;**

**2.** Claims made;

**3.** Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the auto accident.

**C.** The limit of liability shall be reduced by all sums:

   1. Paid because of any **bodily injury** by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid under Part **A;**

   2. Paid or payable because of the **bodily injury** under any workers compensation law or similar law; and

   3. Paid or payable because of any **bodily injury** under any basic reparations benefits applicable for the same element of loss.

**D.** No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and Part **A** or any Medical Payments Coverage of this policy.

**E.** We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible.

**F.** We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any of the following or similar law:

   1. Workers compensation law; or

   2. Disability benefits or occupational disease laws.

**G.** A vehicle and attached trailer are considered one vehicle. Therefore the limits of liability will not be increased for an accident involving a vehicle which has an attached trailer.

### OTHER INSURANCE

If there is other applicable insurance available under one or more policies or provisions of coverage that is similar to the insurance provided under this coverage:

**A.** Any recovery for damages under all such policies or provisions of coverage may equal but not exceed the highest applicable limit for any one vehicle under any insurance providing coverage on either a primary, secondary or excess basis.

**B.** Subject to paragraph **A.** above, with respect to **bodily injury** to an **insured:**

   1. While **occupying** a vehicle owned by that **insured,** only the Uninsured/Underinsured Motorists Coverage applicable to that vehicle will apply, and no other policies or provisions of coverage will apply.

   2. While **occupying** a vehicle not owned by that **insured,** or while not **occupying** any

vehicle, the following priorities of recovery apply:

   **FIRST**    The Uninsured/Underinsured Motorists Coverage applicable to the vehicle the **insured** was **occupying** at the time of the accident.

   **SECOND**    Any policy affording Uninsured/Underinsured Motorists Coverage to the **insured** as a named insured.

   **THIRD**    Any policy affording Uninsured/Underinsured Motorists Coverage to the **insured** as a **family member.**

**C.** With respect to the second and third priorities, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all limits applicable on the same level of priority.

### ADDITIONAL DUTIES

A person seeking Uninsured/Underinsured Motorists Coverage must also promptly:

   1. Send us copies of the legal papers if a suit is brought; and

   2. Notify us in writing of a tentative settlement between the **insured** and the insurer of the **underinsured motor vehicle** and allow us 30 days to advance payment to that **insured** in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such **underinsured motor vehicle.**

### UNDERINSURED MOTORISTS CONVERSION COVERAGE

If the Declarations indicates that Underinsured Motorists Conversion Coverage applies, the following provisions apply:

**A.** The definition of "**underinsured motor vehicle**" is replaced by the following:

"**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type for which the sum of all payments received by or on behalf of the **insured,** from or on behalf of any persons or organizations who may be legally responsible, is less than the fair, just and reasonable damages of the **insured.**

**B.** With respect to coverage provided under the above definition of **underinsured motor vehicle,** paragraph **C.** of the Limit of Liability provision does not apply.

## PART D — COVERAGE FOR DAMAGE TO YOUR AUTO

### INSURING AGREEMENT

**A.** We will pay for direct and accidental loss to your covered auto or any **non-owned auto,** including its equipment, any child safety seat in use in **your covered auto** or **non-owned auto,** minus any applicable deductible shown in the Declarations. We will pay for loss to **your covered auto** caused by:

   **1.** Other than **collision** only if the Declarations indicate that Comprehensive Coverage is provided for that auto.

   **2.** **Collision** only if the Declarations indicate that Collision Coverage is provided for that auto.

If there is a loss to a **non-owned auto,** we will provide the broadest coverage applicable to any vehicle shown in the Declarations.

### Deductible

Unless stated otherwise, the applicable deductible shown in the Declarations shall be applied to each accidental loss covered under this Part of the policy. However,

   **a.** if loss to more than one of **your covered autos** or a **non-owned auto** results from the same loss, only the highest applicable deductible will apply;

   **b.** in the event of a **collision** with another vehicle insured by a Safeco insurance company, other than a vehicle described as **your covered auto** or **non-owned auto,** no deductible will apply.

**B.** **"Collision"** means the upset of **your covered auto** or a **non-owned auto** or its impact with another vehicle or object.

**"Comprehensive"** means loss, other than **collision,** to **your covered auto** or a **non-owned auto.** Losses caused by the following are not **collision** losses but are **comprehensive** losses:

Loss caused by missiles or falling objects; fire; theft or larceny; explosion or earthquake; windstorm; hail, water or flood; malicious mischief or vandalism; riot or civil commotion; contact with a bird or animal; or breakage of glass.

If breakage of glass is caused by a **collision,** you may elect to have it considered a loss caused by **collision.**

**C.**  **1.**  **"Non-owned auto"** means:

      **a.** Any private passenger auto, pickup, van (other than cargo van) or **trailer** with a Gross Vehicle Weight Rating of 12,000 pounds or less or any cargo van or moving van with a Gross Vehicle Weight Rating of 18,000 pounds or less, not owned by or furnished or available for the regular use of you or any **family member** while in the custody of or being operated by you or any **family member;** or

      **b.** Any auto or **trailer** you do not own while used as a temporary substitute for **your covered auto** which is out of normal use because of its:

         **(1)** breakdown;

         **(2)** repair;

         **(3)** servicing;

         **(4)** loss; or

         **(5)** destruction.

   **2.** **"Non-owned auto"** does not include any vehicle which has been operated or rented by or in the possession of an **insured** for 30 or more consecutive days. This does not apply to a temporary substitute vehicle authorized by us.

**D.** **"Camper body"** means a body equipped as sleeping or living quarters which is designed to be mounted on a pickup.

**E.** **"Diminution in value"** means the actual or perceived loss in market or resale value which results from a direct and accidental loss.

### TRANSPORTATION EXPENSES

**A.** Subject to the limitations described in paragraphs **B.** and **C.,** below, we will pay:

   **1.** Temporary transportation expenses incurred by you in the event of the total theft of **your covered auto** or a **non-owned auto.** We will pay for such expenses only if the Declarations indicate that Comprehensive Coverage is provided for that auto. We will pay only expenses incurred during the period:

      **a.** beginning 48 hours after the theft; and

      **b.** ending when **your covered auto** or the **non-owned auto** is returned to use or we pay for its loss.

   **2.** Indirect loss expenses for which you become legally responsible in the event of a loss to a **non-owned auto.** We will pay only expenses beginning when the **non-owned auto** is withdrawn from use for

more than 24 hours. We will pay for indirect loss expenses if the loss is caused by:

**a.** a **comprehensive** loss only if the Declarations indicate that Comprehensive Coverage is provided for any **your covered auto.**

**b.** **collision** only if the Declarations indicate that Collision Coverage is provided for any **your covered auto.**

**B.** For the expenses described in paragraphs **A.1.** and **A.2.** we will pay the greater of the following, without application of a deductible:

**1.** Up to $25 per day, to a maximum of $750; or

**2.** The limit for Loss of Use, if any, shown in the Declarations.

**C.** Our payment for the expenses described in paragraphs **A.1.** and **A.2.** will be limited to that period of time reasonably required to repair or replace the **your covered auto** or the **non-owned auto.**

## EXCLUSIONS

We will not pay for:

**1.** Loss to **your covered auto** or any **non-owned auto** which occurs while it is being used as a public or livery conveyance. This exclusion **(1.)** does not apply to a share-the-expense car pool.

**2.** Loss to **your covered auto** or any **non-owned auto** while employed in the pickup or delivery of newspapers or magazines, food or any products for the purpose of compensation. This exclusion does not apply to delivery that is incidental to an **insured's business.**

**3.** Damage or loss due and confined to:

**a.** wear and tear;

**b.** freezing;

**c.** mechanical or electrical breakdown or failure; or

**d.** road damage to tires.

This exclusion **(3.)** does not apply if the damage results from the total theft of **your covered auto** or any **non-owned auto.**

**4.** Damage or loss arising out of neglect. Neglect means your failure to adequately maintain **your covered auto** or **non-owned auto** after the loss.

With respect to water under Comprehensive Coverage, there is no coverage for:

**a.** moisture, condensation, humidity, or vapor;

**b.** water intrusion around or through panels, surfaces and seals; or

**c.** water that collects in spaces or ventilation systems; or

**d.** **fungi,** dry rot or bacteria;

resulting from neglect.

**5.** Loss due to or as a consequence of:

**a.** discharge of any nuclear weapon (even if accidental);

**b.** war (declared or undeclared);

**c.** civil war;

**d.** insurrection; or

**e.** rebellion or revolution.

**6.** Loss from or as a consequence of the following, whether controlled or uncontrolled or however caused:

**a.** nuclear reaction;

**b.** radiation; or

**c.** radioactive contamination.

**7.** Loss to:

**a.** any electronic equipment designed for the production or reproduction of sound, pictures, audio, visual or data or that receives or transmits sound, pictures or data signals.

**b.** This exclusion **(7.)** does not apply to:

**(1)** equipment designed for the reproduction of sound or transmission of sound, pictures, audio, visual or data signals and accessories used with such equipment, provided:

**(a)** the electronic equipment is permanently installed by the original vehicle manufacturer or manufacturer's dealership in **your covered auto** or any **non-owned auto;** or

**(b)** the electronic equipment is:

**i.** removable from a housing unit which is permanently installed by the original vehicle manufacturer or manufacturer's dealership in the auto;

**ii.** designed to be solely operated by use of the power from the auto's electrical system; and

1611



      **iii.** in or upon **your covered auto** or any **non-owned auto;**

      at the time of loss.

   **(c)** any equipment installed through our Teensurance™ program.

   We will pay up to a total of $1,000 or the actual cash value of **your covered auto** or **non-owned auto,** whichever is less, for all such equipment that is installed in locations not used by the original vehicle manufacturer for installation of such equipment.

  **(2)** any other electronic equipment that is:

   **(a)** necessary for the normal operation of the auto or the monitoring of the auto's operating systems;

   **(b)** an integral part of the same unit housing any electronic equipment described in **7.a.** and permanently installed by the original vehicle manufacturer or manufacturer's dealership in **your covered auto** or any **non-owned auto.**

**8.** Loss to:

  **a.** tapes, records, discs, or other media used with such equipment described in exclusion **(7.);** or

  **b.** any other accessories, not permanently installed used with such equipment described in exclusion **(7.).**

**9.** Loss to **your covered auto** or any **non-owned auto** due to destruction or confiscation by governmental or civil authorities because you or any **family member:**

  **a.** engaged in illegal activities; or

  **b.** failed to comply with Environmental Protection Agency or Department of Transportation standards.

  This exclusion **(9.)** does not apply to the interests of Loss Payees in **your covered auto.**

**10.** Loss to a **camper body,** motorhome or **trailer** you own which is not shown in the Declarations. This exclusion **(10.)** does not apply to a **camper body,** motorhome or **trailer** you:

**a.** acquire during the policy period; and

**b.** ask us to insure within 30 days after you become the owner.

**11.** Loss to any **non-owned auto** when used by you or any **family member** without the express or implied permission of the owner or other person having lawful possession, or using a vehicle beyond the scope of the permission granted.

**12.** Loss to equipment, whether operational or not, whose design may be used for the detection or location of law enforcement equipment.

**13.** Loss to any **non-owned auto** being maintained or used by any person while employed or otherwise engaged in the **business** of:

  **a.** selling;

  **b.** repairing;

  **c.** servicing;

  **d.** storing; or

  **e.** parking;

  vehicles designed for use on public highways. This includes road testing and delivery.

**14.** Loss to any **non-owned auto** being maintained or used by any person while employed or otherwise engaged in any **business** not described in exclusion **2.** and **13.** This exclusion **(14.)** does not apply to the maintenance or use by you or any **family member** of a **non-owned auto** which is a private passenger auto or **trailer.**

**15.** Loss to **your covered auto** or any **non-owned auto** while it is:

  **a.** operating on a surface designed or used for racing. This does not apply to an organized and controlled event that is not a speed, performance, stunt or demolition event;

  **b.** participating in a high performance driving or racing instruction course or school; or

  **c.** preparing for, practicing for, used in, or competing in any prearranged or organized:

   **(1)** race activity; or

   **(2)** speed, performance, stunt, or demolition contest or exhibition.

**16.** Loss to, or loss of use of, a **non-owned auto** rented by:

  **a.** you; or

  **b.** any **family member;**

if a rental vehicle company is precluded from recovering such loss or loss of use, from you or that **family member,** pursuant to the provisions of any applicable rental agreement or state law.

17. Loss to **your covered auto** or any **non-owned auto,** arising out of the actual, alleged or threatened presence, growth, proliferation or spread of **fungi,** dry rot or bacteria.

18. Loss to **your covered auto, non-owned auto,** or **trailer,** for **diminution in value.**

19. Loss in excess of $1,000 per claim or the actual cash value of **your covered auto** or any **non-owned auto,** whichever is less, for any furnishings or equipment that were not installed by the original vehicle manufacturer or manufacturer's dealership which mechanically or structurally changes your vehicle and results in increase in performance or change in appearance, including but not limited to:

    a. custom murals, paintings or other decals or graphics;

    b. custom wheels, tachometers, pressure and temperature gauges;

    c. modified or custom engines and fuel systems, light bars, racing slicks and/or oversized tires, roll bars and lift kits, winches, utility boxes, and tool boxes; or

    d. non-standard paint.

    This exclusion does not apply to equipment installed to make a vehicle handicap accessible.

20. Loss arising out of the use of **your covered auto** while leased or rented to others.

21. Loss to **your covered auto** or a **non-owned auto** caused by an intentional act by you or a **family member,** or at the direction of you or a **family member.**

## LIMIT OF LIABILITY

A. At our option, our limit of liability for loss will be the lowest of:

1. The actual cash value of the stolen or damaged property;

2. a. The amount necessary to repair or replace the property;

    b. Determination of the cost of repair or replacement will be based upon one of the following:

        (1) the cost of repair or replacement agreed upon by you and us;

        (2) a competitive bid approved by us; or

        (3) an estimate written based upon the prevailing competitive price. You agree with us that we may include in the estimate parts furnished by the original vehicle manufacturer or parts from other sources including non-original equipment manufacturers. The prevailing competitive price means prices charged by a majority of the repair market in the area where the vehicle is to be repaired as determined by us; or

3. The limit of liability shown in the Declarations.

However, the most we will pay for loss to any **non-owned auto,** which is a **trailer,** is $1,500.

B. When replacing parts normally subject to repair or replacement during the useful life of the vehicle, we will not pay for the amount of any betterment.

## PAYMENT OF LOSS

We may pay for loss in money or repair or replace the damaged or stolen property. We may, at our expense, return any stolen property to:

1. You; or

2. The address shown in this policy.

If we return stolen property we will pay for any damage resulting from the theft. We may keep all or part of the property at an agreed or appraised value.

If we pay for loss in money, our payment will include the applicable sales tax for the damaged or stolen property.

## NO BENEFIT TO BAILEE

This insurance shall not directly or indirectly benefit any carrier or other bailee for hire.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a **non-owned auto** shall be excess over any other collectible source of recovery including, but not limited to:

1. Any coverage provided by the owner of the **non-owned auto;**

2. Any other applicable physical damage insurance;

3. Any other source of recovery applicable to the loss.

1812

**APPRAISAL**

**A.** If we and you do not agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will select a competent appraiser. The two appraisers will select an umpire. The appraisers will state separately the actual cash value and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

    **1.** Pay its chosen appraiser; and

    **2.** Bear the expenses of the appraisal and umpire equally.

**B.** We do not waive any of our rights under this policy by agreeing to an appraisal.

**STORAGE COSTS**

If you give us your consent, we may move the damaged property, at our expense, to reduce storage costs during the claims process. If you do not give us your consent, we will pay only the storage costs which would have resulted if we had moved the damaged property.

---

## PART E — DUTIES AFTER AN ACCIDENT OR LOSS

---

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**A.** We must be notified promptly of how, when and where the accident or loss happened. Notice should also include the names and addresses of any injured persons and of any witnesses.

**B.** A person seeking any coverage must:

    **1.** Cooperate with us in the investigation, settlement or defense of any claim or suit.

    **2.** Promptly send us copies of any notices or legal papers received in connection with the accident or loss.

    **3.** Submit, as often as we reasonably require:

        **a.** to physical examinations by physicians we select. We will pay for these exams.

        **b.** to examination under oath and subscribe the same. We may examine any **insured** separately and apart from the presence of any other **insured.**

    **4.** Authorize us to obtain:

        **a.** medical reports; and

        **b.** other pertinent records.

    **5.** Submit a proof of loss, under oath if requested, when required by us.

**C.** A person seeking Basic Reparations Benefits coverage must:

    **1.** Submit, as often as we reasonably require, to physical examinations by physicians we select. We will pay for these exams. A copy of the report will be sent to the injured person if requested. If you or a **family member** object to the physician we select, that person should notify us of the objection in writing. In this event we will attempt to select a physician acceptable to you or a **family member.** If there is no agreement on a physician, application may be made to the Connecticut Insurance Commissioner to select a physician. The injured person must submit to examination by the physician selected by the Insurance Commissioner.

    **2.** Authorize us to obtain:

        **a.** Medical reports;

        **b.** Statements of earnings; and

        **c.** Other pertinent records.

**D.** A person seeking Uninsured/Underinsured Motorists Coverage must also:

    **1.** Promptly report the accident to the police or other civil authority if a hit-and-run driver is involved.

    **2.** Promptly send us copies of the legal papers if a suit is brought.

**E.** A person seeking Coverage for Damage to Your Auto must also:

    **1.** Take reasonable steps after loss to protect **your covered auto** or any **non-owned auto** and its equipment from further loss. We will pay reasonable expenses incurred to do this.

    **2.** Promptly notify the police if **your covered auto** or any **non-owned auto** is stolen.

    **3.** Permit us to inspect and appraise the damaged property before its repair or disposal.

1812X

## PART F — GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

**A.** This policy applies only to accidents and losses which occur:

    **1.** During the policy period as shown in the Declarations; and

    **2.** Within the policy territory.

**B.** The policy period is the period stated in the Declarations. The policy may be renewed for successive policy periods if the required premium is paid and accepted by us on or before the expiration of the current policy period. The premium will be computed at our then current rate for coverage then offered.

**C.** The policy territory is:

    **1.** The United States of America, its territories or possessions;

    **2.** Puerto Rico; or

    **3.** Canada.

This policy also applies to loss to, or accidents involving, **your covered auto** while being transported between their ports.

### BANKRUPTCY

Bankruptcy or insolvency of the **insured** shall not relieve us of any obligations under this policy.

### CHANGES

**A.** This policy, your Declarations page and endorsements issued by us to this policy contain all the agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us.

**B.** The premium for your policy is based on information we have received from you or other sources. You agree to cooperate with us in determining if this information is correct and complete and you will notify us if it changes. If this information is incorrect, incomplete, or changes, we will adjust your premium during the policy term or take other appropriate action based upon the corrected, completed or changed information. Changes during the policy term that will result in a premium increase or decrease during the policy term include, but are not limited to, changes in:

    **1.** The number, type or use classification of insured vehicles.

    **2.** Operators using insured vehicles including newly licensed **family member** drivers and any household members that have licenses.

    **3.** The location where your vehicle is principally garaged.

    **4.** Customized equipment or parts.

You also agree to disclose all licensed drivers residing in your household.

**C.** If we make a change which broadens coverage under this edition of your policy without additional premium charge, that change will automatically apply to your policy as of the date we implement the change in your state. This paragraph **(C.)** does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

    **1.** A subsequent edition of your policy; or

    **2.** An Amendatory Endorsement.

**D.** Additional or return premium of $3.00 or less resulting from policy changes will be waived. We will return this waived premium at your request.

### PAYMENT OF PREMIUM

If your initial premium payment is by check, draft, or any remittance other than cash, coverage under this policy may be canceled retroactive to the effective date of the policy if the check, draft, or remittance is not honored upon presentment to the bank or other financial institution. If we receive payment of the initial premium within fifteen (15) days of our issuance of a notice of cancellation and the payment is honored by the bank or other financial institution, your policy will be reinstated without any lapse.

### FRAUD

This policy was issued in reliance upon the information provided on your application. We may void this policy if you or an **insured** have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, at the time application was made or any time during the policy period. However, the provisions of this paragraph will not apply to Part **A** — Liability Coverage.

We may void this policy or deny coverage for an accident or loss if you or an **insured** have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

We may void this policy or deny coverage for fraud or material misrepresentation even after the occurrence of an accident or loss. This means we will not be liable for any claims or damages which would otherwise be covered. If we make a payment, we may request that you reimburse us. If so requested, you must reimburse us for any payments we may have already made.

**LEGAL ACTION AGAINST US**

A.  No legal action may be brought against us until there has been full compliance with all the terms of this policy. In addition, under Part **A,** no legal action may be brought against us until:

1.  We agree in writing that the **insured** has a legal obligation to pay damages; or

2.  The amount of that obligation has been finally determined by judgment after trial.

B.  No person or organization has any right under this policy to bring us into any action to determine the legal liability of an **insured.**

C.  All claims or suits under Part **C** of this policy must be brought within three years of the date of the accident. However, in the case of a claim involving an **underinsured motor vehicle,** the **insured** may toll any applicable limitation period by:

1.  Notifying us prior to expiration of the three year period, in writing, of any claim the **insured** may have for Underinsured Motorists Coverage; and

2.  Commencing suit proceedings not more than 180 days from the date of exhaustion of the limits of liability under all automobile bodily injury bonds or policies applicable at the time of the accident by settlements or final judgments after any appeals.

**OUR RIGHT TO RECOVER PAYMENT**

A.  If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another person, entity or organization we shall be subrogated to that right. That person shall:

1.  Do whatever is necessary to enable us to exercise our rights; and

2.  Do nothing after loss to prejudice them.

However, our rights in this paragraph **(A.)** do not apply under Part **D,** against any person using **your covered auto** with your express or implied permission or other person having lawful possession and is not using a vehicle beyond the scope of the permission granted.

This paragraph **(A.)** does not apply with respect to damages caused by an **underinsured motor vehicle.**

B.  If we make a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall:

1.  Hold in trust for us the proceeds of the recovery; and

2.  Reimburse us to the extent of our payment.

C.  This provision does not apply to Reparations Benefits Coverage or any Medical Payments Coverage.

D.  With respect to damages caused by an accident with an **uninsured motor vehicle.** If we make payment under this policy and the person to or for whom payment was made has a right to recover damages from another we may require that person to:

1.  Hold in trust all rights against third parties.

2.  Exercise that person's right to recover damages against a third party and reimburse us out of any recovery to the extent of our payment.

**TERMINATION**

A.  **Cancellation.** This policy may be canceled during the policy period as follows:

1.  The named insured shown in the Declarations may cancel by:

a.  returning this policy to us; or

b.  giving us advance written or verbal notice of the date cancellation is to take effect.

2.  We may cancel by mailing by registered or certified mail or United States Post Office certificate of mailing to the named insured shown in the Declarations at the address shown in this policy:

a.  at least 15 days notice if cancellation is for nonpayment of premium of the first premium, and this is not a renewal or continuation policy.

b.  at least 10 days notice:

(1)  if cancellation is for nonpayment or premium other than as described in **a.** above; or

(2)  if cancellation is due to material misrepresentation and notice is mailed during the first 60 days this policy is in effect, and this is not a renewal policy; or

c.  at least 45 days notice in all other cases.

3.  After this policy is in effect for 60 days, or if this is a renewal policy, we will cancel only:

a.  for nonpayment of premium; or

b.  if your driver's license or that of:

(1)  any driver who lives with you; or

(2)  any driver who customarily uses **your covered auto;**

has been revoked during the policy period.

B.  **Nonrenewal.** If we decide not to renew this policy, we will mail notice by registered or certified mail or United States Post Office

Certificate of Mailing, to the named insured shown in the Declarations at the address shown in this policy. Notice will be mailed at least 60 days before the end of the policy period. We will have the right not to renew at the end of each six month policy period.

**C. Automatic Termination.** If we offer to renew and you or your representative do not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal premium when due shall mean that you have not accepted our offer.

We will mail or deliver any premium billing notice for renewal or continuation of this policy to the named insured shown in the Declarations at the address shown in this policy not less than 30 days in advance of the renewal date or anniversary date of this policy.

Coverage for **your covered auto** shall automatically terminate on the effective date of any other motor vehicle insurance policy covering that vehicle.

**D. Other Termination Provisions.**

1. If the law in effect in your state at the time this policy is issued or renewed:

   a. requires a longer notice period;

   b. requires a special form of or procedure for giving notice; or

   c. modifies any of the stated termination reasons;

   we will comply with those requirements.

2. We may deliver any notice instead of mailing it. Proof of mailing of any notice shall be sufficient proof of notice.

3. If this policy is canceled, you may be entitled to a premium refund. If so, we will send you the refund. The premium refund, if any, will be computed according to our manuals. However, making or offering to make the refund is not a condition of cancellation.

4. The effective date of cancellation stated in the notice shall become the end of the policy period.

## TRANSFER OF YOUR INTEREST IN THIS POLICY

**A.** Your rights and duties under this policy may not be assigned without our written consent. However, if a named insured shown in the Declarations dies, coverage will be provided for:

1. The surviving spouse, civil partner or domestic partner if resident in the same household at the time of death. Coverage applies to the spouse, civil partner or domestic partner as if a named insured shown in the Declarations; and

2. The legal representative of the deceased person as if a named insured shown in the Declarations. This applies only with respect to the representative's legal responsibility to maintain or use **your covered auto.**

**B.** Coverage will only be provided until the end of the policy period.

## TWO OR MORE AUTOS INSURED; TWO OR MORE AUTO POLICIES

If this policy insures two or more autos or if any other auto insurance policy issued to you by us applies to the same accident, the maximum limit of our liability shall not exceed the highest limit applicable to any one auto. In no event shall the limit of liability of two or more motor vehicles or two or more policies be added together, combined, or stacked to determine the limit of insurance coverage available to you or any **insured.**

## LOSS PAYABLE CLAUSE

As to the interest of the loss payee, this policy will remain in effect from the inception date and until ten days after proof of mailing that the cancellation notice has been mailed to the loss payee. When we pay the loss payee we shall, to the extent of payment, have the loss payee's rights of recovery.

Where fraud, misrepresentation, material omission, or intentional damage has been committed by or at the direction of any **insured,** or where the loss is otherwise not covered under the terms of the policy, the loss payee or lienholder's interest will not be protected.

## NAMED DRIVER EXCLUSION

If there is an excluded driver under this policy, then we will not provide coverage for any claim arising from an accident or loss involving a motor vehicle being operated by that excluded person. This includes any claim for damages made against you or any **family member** or any other person or organization that is vicariously liable for an accident arising out of the operation of a motor vehicle by the excluded driver. This exclusion does not apply to any **insured** covered under Part **B**—Medical Payments Coverage or Part **C** — Uninsured/Underinsured Motorists Coverage.

1814

## ADDITIONAL COVERAGES

**AGREEMENT: WE WILL PROVIDE THE INSURANCE DESCRIBED IN EACH OF THE FOLLOWING ADDITIONAL COVERAGES ONLY IF INDICATED IN THE DECLARATIONS.**

### ADDED REPARATIONS BENEFITS COVERAGE

The Definitions and General Provisions of this policy and the provisions of the Basic Reparations Benefits Coverage apply unless modified below.

We will pay Added Reparations Benefits as stated in the Declarations to or for you or a **family member** who sustains **bodily injury:**

1. Caused by an accident; and

2. Resulting from the ownership, maintenance or use of an **auto** as an **auto.**

The limit of liability for Added Reparations Benefits includes the total amount of these benefits (Basic plus Added).

### LIMIT OF LIABILITY

The limit of liability shown in the Schedule for Basic Reparations Benefits Coverage is amended as follows:

1. The Maximum Aggregate Limit of $5,000 is changed to the amount stated in the Declarations for Added Reparations Benefits.

2. The Maximum Weekly Limit of $200 for Work Loss Benefits and Survivor's Loss Benefits is changed to the amount shown in the table below opposite the letters "A," "B" or "C". If no letter is shown following the amount stated in the Declarations, the Maximum Weekly Limit of $200 remains unchanged.

| If the amount stated in the Declarations is: | The maximum weekly limit is: |
|---|---|
| $25,000 A | $300 |
| 25,000 B | 400 |
| 25,000 C | 500 |

### FULL SAFETY GLASS MANDATORY OFFER COVERAGE

The provisions of the policy apply unless modified below:

For an additional premium, we will pay under Comprehensive Coverage for the full cost of repairing or replacing damaged safety glass on **your covered auto,** or a **non-owned auto,** without a deductible. We will pay only if the Declarations indicate that Comprehensive Coverage and Full Safety Glass Coverage apply.

### ROADSIDE ASSISTANCE COVERAGE CALL 1-877-ROAD 101 (1-877-762-3101)

"**Your covered auto**" as used in this endorsement means a private passenger vehicle, motor home or trailer owned by you and for which a specific premium is shown on the Declarations for this coverage.

The following coverages apply to each vehicle for which this coverage is shown on the Policy Declarations:

1. Each time **your covered auto** or any **non-owned auto** is disabled due to mechanical or electrical breakdown we will pay reasonable and necessary expenses for the use of an **authorized service provider** to tow or flatbed **your covered auto** or **non-owned auto** up to 10 miles or to the nearest qualified place where necessary repairs can be made during regular **business** hours.

2. Each time **your covered auto** or any **non-owned auto** is disabled requiring:

   a. Towing to dislodge the vehicle from its place of disablement within 100 feet of a public street or highway; or

   b. Labor, including change of tire, at the place of its breakdown; or

   c. Delivery of fuel, oil, water or other fluids (we do not pay the costs of these items); or

   d. Key lock-out services;

   we will cover up to one (1) hour of labor for the use of an **authorized service provider** for service at the place of disablement.

3. For policies with a 6 month policy term, coverage is limited to no more than two occurrences per vehicle plus an additional two occurrences per policy in a 6 month policy period for both coverages **1.** and **2.,** above.

4. For policies with an annual policy term, coverage is limited to no more than four occurrences per vehicle plus an additional four occurrences per policy in a 12 month policy period for both coverages **1.** and **2.** above.

**Authorized service provider** means a service provider contracted by us providing, at no charge to you, roadside assistance as described and limited above.

1814X

When service is provided by other than an **authorized service provider,** we will reimburse you only for reasonable charges as determined by us.

No deductible applies to this coverage.

---

### LOSS OF USE COVERAGE

The provisions and exclusions that apply to Part **D** —Coverage for Damage to Your Auto also apply to this coverage except as changed below:

When there is a loss to any vehicle described in the Declarations for which a specific premium charge indicates that Loss of Use Coverage is afforded, we will reimburse you for expenses you incur to rent a substitute vehicle.



This coverage applies only if:

1. The vehicle is withdrawn from use for more than 24 hours;

2. The loss is caused by **collision,** or is covered by the Comprehensive Coverage of this policy; and

3. The loss exceeds the appropriate **collision** or **comprehensive** deductible applying to the vehicle.

However, this coverage does not apply to losses caused by **collision** if Collision Coverage does not apply to the vehicle.

Our payment will be limited to that period of time reasonably required to repair or replace the vehicle. We will pay up to the amount per day and the maximum shown for Loss of Use in the Declarations.

No deductible applies to this coverage.



## ANTIQUE AUTO ENDORSEMENT

With respect to any auto insured as an Antique Auto (AA):

Coverage applies provided such auto is maintained solely for use in exhibitions, club activities, parades or other functions of public interest, and is only used infrequently for other purposes.

The Limit of Liability provision under Part D — Coverage for Damage to Your Auto is replaced by the following:

**LIMIT OF LIABILITY**

**A.** Our limit of liability for a partial loss will be the lesser of the:

    **1.** Actual cash value of the stolen or damaged property; or

    **2.** Amount necessary to repair or replace the property; or

    **3.** Maximum limit of liability shown in the Declarations.

**B.** Our limit of liability for a total loss will be the amount shown for each scheduled antique auto which is agreed to be the value of **your covered auto.**

**C.** Any depreciation of the value of the auto due to unavailability of any part of the auto does not constitute loss.



SA-1652/EP 5/97



This policy has been signed by our President and Secretary.

Paul Condrin
President

Dexter Legg
Vice President and Secretary

This policy includes copyrighted material of Insurance
Services Office, Inc. with its permission.

SA-1701/EP 9/90
G16



## AUTO LOAN/LEASE COVERAGE

With respect to this coverage, the provisions of the policy apply unless modified below:

### Auto Loan/Lease Coverage

In the event of a total loss to a vehicle shown in the Declarations for which a specific premium charge indicates that Auto Loan/Lease Coverage applies, we will pay any unpaid amount due on the lease or loan for **your covered auto** less:

**1.** The amount paid under Part D of the policy; and

SA-1914/EP 2/93
G1

**2.** Any:

    **a.** overdue loan/lease payments at the time of loss;

    **b.** financial penalties imposed under a lease for excessive use, abnormal wear and tear or high mileage;

    **c.** security deposits not refunded by a lessor;

    **d.** cost for extended warranties, Credit Life Insurance, Health, Accident or Disability insurance purchased with the loan or lease; or

    **e.** carry-over balances from previous loans or leases.



1618



## HOW YOUR AUTO RATES ARE DETERMINED

Your automobile rates are determined by a number of factors, including your driving record, the kind of car you drive, your age, where the car is located, and how it is used. The following information provides specific details on how these rates are determined and what you can do to keep the cost of your insurance as low as possible.

### DRIVING RECORD

One of the main factors determining the amount you pay for insurance is your driving record. Accidents and violations add to the cost of insurance through a system of "points." The more serious the incident, the higher the number of points and the higher the premium. Points are assigned for tickets and accidents that occurred in the three years preceding renewal date of the policy. These are automatically dropped at the first renewal after thirty-four (34) months.

Driving record points for traffic convictions or bail forfeitures are charged as follows:

Points are assigned for the first alcohol or drug violation. More points are assigned for each additional alcohol or drug violation.

Points are assigned for major violations which include but are not limited to: failure to stop and report when involved in an accident, homicide or assault arising from the operation of an automobile, driving while license is suspended or revoked, or reckless driving.

Points may be assigned for any minor traffic convictions.

Driving record points for accidents are charged as follows:

Points for each automobile accident involving you or any operator of the automobile who resides with you and is not the named insured or principal operator on another insurance policy. Accidents must result in bodily injury or death or result in payment in excess of $1,000 by all insurance companies for property damages. Except, no points are assigned for: the first accident resulting in $1,000 property damage without any bodily injury; the first or second accident where you were not convicted of a violation and were not at fault; you were reimbursed by the other party; you were struck in the rear and did not receive a violation in conjunction with the accident; the other driver was cited and you were not; your auto was lawfully parked; you were struck by a "hit-and-run" driver and you reported it to the proper authorities within 24 hours; you were not convicted of a moving traffic violation and the only payments were under basic or added reparations benefits; you were operating an emergency vehicle as a paid or volunteer member of a police or fire department, aid squad or law enforcement agency during an emergency situation; the accident involved hitting an animal; damage was caused by flying gravel, missiles, or falling objects.

These points result in surcharges that are applied to your policy.

### KIND OF VEHICLE

Your vehicle's age, make and model also play a role in how much you pay for insurance. Newer and more expensive vehicles generally cost more to insure since they cost more to repair or replace.

### YOUR AGE, WHERE YOU LIVE, AND USE OF VEHICLE

Statistics show that the younger you are, the more likely you are to be in an accident (up to about age 65). Therefore, younger drivers pay more for insurance. Where your vehicle is located and how you use it also play a role in how much you pay for insurance. If you live in the country and only use your car to go to the grocery store or other errands, you'll pay less than someone who lives in the heart of a congested urban area and drives 40 miles to work every day. As theft and vandalism are also more likely to occur in the city, costs to insure damage to your vehicle are increased.

### WHAT YOU CAN DO TO LOWER YOUR INSURANCE RATES

Some factors determining rates are out of your control, such as your age. However, there are things you can do to lower your costs. One of the best ways is to maintain a clean driving record. Other factors that influence the amount you pay for insurance include the amount and type of coverage you select. If you have any questions about how your insurance rates are determined, please contact your Safeco agent, whose number is listed on your billing statement.

One choice you have already made will save you money over time — you have chosen Safeco, a company dedicated to insuring responsible people who drive carefully. We are also constantly striving to reduce our own expenses and assisting in the prevention of fraud. This keeps our costs down, so we can pass these savings on to you.

Thank you for entrusting us with your insurance needs. We appreciate having you as a customer.

## INFORMATION ON COVERAGE FOR DAMAGE TO RENTED VEHICLES

The following information is being provided to explain the coverage that already exists in your Auto Policy for damage to a rented vehicle. This notice does not add to, replace, or alter any of the provisions in your current policy.

Damage to a rented vehicle is covered in **PART D — COVERAGE FOR DAMAGE TO YOUR AUTO.** Your policy treats rental vehicles as if you owned the vehicle. Therefore, damage to a rental vehicle is not included in the **Liability** coverage of your policy. A rental vehicle enjoys the same **Collision** and **Comprehensive** coverages, and is subject to the same deductibles, as the vehicles listed on the enclosed Declarations Page.

Coverage provides for the actual cash value of the vehicle, the amount necessary to repair or replace the vehicle, or the Limit of Liability shown on the Declarations Page, whichever is smallest.

This information is being provided to you in accordance with Connecticut state law.

SA-1592/CTEP 3/95



EXHIBIT F

# RELEASE AND HOLD-HARMLESS AGREEMENT

**FOR AND IN CONSIDERATION** of the delivery of a check to the undersigned in the amount of One Hundred Thousand and No/100 ($100,000.00) dollars made payable to Anthony Grazia, Karen Grazia and Perey Law Group, PLLC, their attorneys, the undersigned does hereby release and forever discharge Vallen Brewer and First National Insurance Company of America, their heirs, executors, employees and agents, officers, attorneys and assigns, from all claims, demands, damages, or causes of action, on account of property damage, bodily injury or death, resulting or to result from an incident which occurred on or about November 16, 2013 in King County, Washington, which is the subject matter of, and more fully described in, King County Cause No. 14-2-22436-2 SEA.

**IT IS UNDERSTOOD THAT THIS IS A FULL AND FINAL RELEASE**, and full compromise settlement of any and all claims of every nature and kind, known or unknown, suspected or unsuspected, involving the parties named above. It is agreed that the undersigned has specifically contemplated and bargained for the assumption of risk of future unknown injuries and damages arising out of or resulting from the accident described above. It is further agreed that this is not an admission of liability on the part of the settling parties, but rather a compromise, the express purpose of which is to preclude any additional claims and avoid the uncertainties of litigation.

**IN CONSIDERATION OF THE SETTLEMENT OF THE CLAIM**, the undersigned does and hereby agrees to satisfy and discharge all valid liens and rights of subrogation in this matter. The undersigned further agrees to indemnify and hold harmless Vallen Brewer and First National Insurance Company of America, their heirs, executors, employees, attorneys and agents, officers, and assigns, from any and all claims and causes of action for liens and/or subrogation interests of any kind arising out of the above-entitled matter, including but not limited to attorney's fees incurred in defending any of the aforementioned claims for liens and/or subrogation claims, or to enforce any of the covenants and obligations set forth above. This agreement includes all lien claims for services rendered pursuant to public or private obligation, contract or statute.

**THIS RELEASE** is being executed after consultation with attorney Douglas Weinmaster. The undersigned states that this release has been carefully read and is signed as their free act and deed.

### CAUTION:  PLEASE READ <u>ALL</u> OF THE ABOVE BEFORE SIGNING

DATED this 16 day of July , 2015.

Anthony Grazia

Karen Grazia

STATE OF CT )
)ss. Sherman
COUNTY OF Fairfield )

On this 16ᵀᴴ day of July , 2015, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared Anthony Grazia and Karen Grazia, to me known to be the individuals described in and who executed the foregoing instrument, and acknowledged to me that they signed said instrument as their free and voluntary act and deed, for the uses and purposes therein mentioned.

WITNESS my hand and official seal hereto affixed the day and year first above written.

Elaine A Johnson

NOTARY PUBLIC in and for the State of Washington
Residing at CT.
My Commission Expires:

ELAINE A. JOHNSON
NOTARY PUBLIC
STATE OF CONNECTICUT
MY COMM. EXP. 08-31-2017

EXHIBIT G



STATE OF WASHINGTON
## DEPARTMENT OF LABOR AND INDUSTRIES
Public Records Unit • PO Box 44632 Olympia WA 98504-4632
Voice: 360.902.5556     Fax: 360.902.5529

### CERTIFICATION

RE:     Anthony Grazia
       Claim number(s): ZB06795

I, Donna Desch, being the duly authorized records custodian, of the State of Washington Department of Labor and Industries, do hereby certify that the enclosed records are true and accurate copies of the official public records maintained by this agency regarding the above-named individual.

Dated this 8th day of May 2017, under my hand and seal at Olympia, Washington.



Donna Desch
Records Custodian



STATE OF WASHINGTON

# DEPARTMENT OF LABOR AND INDUSTRIES
THIRD PARTY SECTION   PO BOX 44288
OLYMPIA WASHINGTON   98504-4288

April 28, 2015                          CLAIM ID: ZB06795  UNIT: 7
                                        INJURY DATE: 11/17/13

DOUG WEINMASTER
PEREY LAW GROUP
1606 8TH AVENUE NORTH
SEATTLE WA  98109

To Whom It May Concern:

To date, the Department of Labor and Industries has spent
$3,600.47 ON ANTHONY GRAZIA.

        Medical Aid Paid......................$   3,600.47
        Accident Fund Paid:
            Time-Loss Compensation...........$      0.00
            Permanent Partial Disability......$      0.00
            PPD Interest.....................$      0.00
            Miscellaneous ...................$      0.00

These amounts, showing our current expenditures, must be paid
back when a settlement is received.  These costs will increase
if we make additional payments.

We suggest that before you make a decision on any settlement
in the third party action, you send a copy of the offer to us.
We will review the offer to make sure it is sufficient to cover
the costs that have been, or will be, paid on the claim.

We also remind you that without our written approval, a
settlement that doesn't cover past and future industrial
insurance costs is invalid.

Please keep us informed on the progress of your case.  If you
have filed a lawsuit, please send us a copy for our records.
If not, please advise us if you prefer Labor and Industries
to consider taking third party action.

We look forward to hearing from you.

Sincerely,


THUCUC T. LE
(360) 902-5101


ST05.0B                        File copy